NATIONAL FARMERS
ORGANIZATION,
INC., Plaintiff,

v.

Richard E. LYNG, Defendant.

Civ. A. No. 88–1718.

United States District Court,
District of Columbia.

Aug. 4, 1988.

Richard A. Green, Philip M. Dearborn, III, Stohlman, Beuchert, Egan and Smith, Washington, D.C., for plaintiff; Marvin Beshore, Milspaw & Beshore, Harrisburg, Pa., of counsel.

Susan A. Nellor, Asst. U.S. Atty., Washington, D.C., for defendant; John D. Griffiths, Office of General Counsel, U.S. Dept. of Agriculture, Washington, D.C., of counsel.

OPINION

HAROLD H. GREENE, District Judge.

Plaintiff National Farmers Organization, Inc. (NFO), an organization which represents, among others, milk farmers, seeks reversal of a decision by the Department of Agriculture (DOA or Department) to exclude its frequency of payment proposals[1] from a multi-issue hearing[2] being held at

---

1. Frequency of payments refers to the number of times per month milk handlers pay milk farmers for milk they produce each day. For the purpose of this action milk handlers are processors, distributors, shippers, and others engaged in the handling, rather than the production, of milk. 7 U.S.C. § 608(c)(1) and (9)(B).

2. These multi-issue hearings usually convene and adjourn and reconvene over a period of several months.

the present time on three milk orders, claiming that the decision was arbitrary and capricious. 5 U.S.C. § 706(2). After consideration of the papers submitted, and following a hearing on July 13, 1988, at which time it denied defendant's motion to dismiss, the Court on July 19, 1988 issued a preliminary injunction.

At the hearing, both sides represented that no genuine material fact remains in dispute and that summary judgment was appropriate. The Court agrees, and it concludes that plaintiff is entitled to judgment as a matter of law.[3]

## I

Over the last half-century, under the authority Congress provided him by the Agricultural Marketing Agreement Act of 1937, as amended (AMAA), 7 U.S.C. § 601 *et seq.*,[4] the Secretary of Agriculture has regulated the prices that handlers pay producers for milk.[5] Not all regions of the country are under milk regulation, but with respect to each region that is so regulated, a federal milk marketing order is in effect which sets out the regulatory parameters applicable in that region.

To effectuate the purposes of the AMAA,[6] the Act also provides *inter alia*

for the amendment of milk marketing orders. Specifically the statute states that, whenever the Secretary "has reason to believe that the issuance of an [amended] order will tend to effectuate the declared policy of th[e AMAA]" with respect to milk, "he shall give due notice of and an opportunity for a hearing" upon one or more proposed amendments to that order. 7 U.S.C. § 608c(3) and (17).

Following such notice and hearing, the Secretary issues an amended order, if he finds, and sets forth in the order, upon the evidence introduced at such hearing, that the issuance of the amended order and the terms and conditions thereof "will tend to effectuate the declared policy of th[e AMAA]" with respect to milk. 7 U.S.C. § 608c(4).[7] Before an amended order becomes effective, it must be approved by two-thirds of the particular region's milk producers. 7 U.S.C. § 608c(9)(B).[8]

## II

In January 1988, the Department announced to interested parties that it was considering conducting a multi-issue hearing [9] concerning proposed amendments to the orders governing the milk markets for New England,[10] New York–New Jersey, and the Middle Atlantic, Orders 1, 2, and 4,

---

3. Although plaintiff did not file a separate written motion for summary judgment, it did request that the Court find in its favor as a matter of law. 6 J. Moore, W. Taggart & J. Wicker, *Moore's Federal Practice* ¶¶ 56.02 and 56.14[1] (2d ed. 1988).

4. *Schepps Dairy, Inc. v. Bergland* discusses the history of and the purposes underlying the AMAA. 628 F.2d 11 (D.C.Cir.1979). The Supreme Court has had several occasions to consider the necessity for and the complexity of milk regulation. *See, e.g., H.P. Hood & Sons v. DuMond,* 336 U.S. 525, 529, 69 S.Ct. 657, 660, 93 L.Ed. 865 (1949); *Nebbia v. New York,* 291 U.S. 502, 516–518, 54 S.Ct. 505, 507–508, 78 L.Ed. 940 (1934); *United States v. Rock Royal Co-op,* 307 U.S. 533, 549–550, 59 S.Ct. 993, 1001–1002, 83 L.Ed. 1446 (1939).

5. It is the underlying basis of the regulation that, because milk is highly perishable and its consumption is subject to seasonal demands, producers of milk would be left vulnerable to

the monopoly power of milk handlers if there were no regulation.

6. With this statute, Congress intended to establish and maintain orderly marketing conditions for agricultural commodities, including the establishment of parity prices to farmers, and the protection of consumer interests. 7 U.S.C. § 602.

7. If the evidence presented at the hearing shows that a proposed amendment does not tend to effectuate such policy, the Secretary does not include it in the amended order.

8. In taking this vote, the Secretary must consider approval or disapproval of a qualified cooperative association as the approval or disapproval of its producer members in such referenda. 7 U.S.C. § 608c(12).

9. Major multi-issue hearings like the one here at issue are held infrequently, the last concerning Orders 2 and 4 having been held in 1983.

10. The New England order is not at issue here.

respectively.[11] At that time, the Department invited interested parties to submit proposals for amendments to any or all of the existing three marketing orders, and it set a deadline of April 8, 1988, for the submission of any proposals.

On April 6, 1988, plaintiff submitted to the Department several proposals, including two regarding the frequency of payments from milk handlers to milk producers under the New York–New Jersey and the Middle Atlantic orders. Each of these proposals called for the handlers to pay the producers three times per month for shipments of milk, in lieu of the current one payment per month in New York–New Jersey region and the two payments per month in the Middle Atlantic region. Plaintiff claims that the existing payment schedules are inadequate to protect milk farmers from financial loss due to the rising tide of bankruptcies among milk handlers because during the period between payments farmers are extending unsecured lines of credit to milk handlers with whom they deal, the credits amounting to 35–53 days' milk production.

On or before April 8, 1988, other interested persons submitted numerous other proposals to the Department concerning the three orders at issue. Among these submissions were two proposals to increase the frequency of payments for the New York–New Jersey region from one payment per month to two. Based on the proposals submitted to the Department, the Dairy Division of the Agricultural Marketing Service (AMS) prepared a draft notice of hearing for review by the Administrator of AMS, the official who has been delegated responsibility for the hearing by the Secretary under the AMAA. 7 C.F.R. Part 2.50. This draft contained several proposals relating to the frequency of payments, including both the proposals of others for twice-a-month payments for Order 2 and plaintiff's three-times-per-month payment proposals for Orders 2 and 4.

After reviewing the draft notice of hearing, the Administrator of the AMS directed the Dairy Division to delete plaintiff's frequency of payment proposals. The Division complied, as it was required to do under the regulations.[12] The revised notice of hearing, noticing sixty-nine proposals applicable to one or more of the three marketing orders encompassed by the hearing, was signed by the Administrator of AMS on June 7, 1988, and was published in the *Federal Register* on June 10, 1988. 53 Fed.Reg. 21825 (June 10, 1988).

On the day he signed the notice of hearing, the Administrator of AMS sent a letter to plaintiff informing it that its frequency of payment proposals for Orders 2 and 4 were not included in the hearing notice, despite the fact that there was "considerable discussion throughout the industry on this producer payment issue" as a "result of recent bankruptcy proceedings involving large dairy operations." The only explanation given for this negative decision was that "based on our discussions with industry representatives, we continue to find very limited support for a change to a three-times-a-month payment schedule under milk orders." [13] There was no indication in the letter or otherwise of the number or identity of the industry representatives contacted, whether they were producers or handlers, the substance of the discussions, and the time frame during which they occurred.

When plaintiff's attempt to seek a reversal of the decision to exclude its frequency of payment proposals failed, it filed this action. Thereafter, on the day the Department filed a motion to dismiss or for summary judgment with respect to this action, an Assistant Secretary of Agriculture wrote to plaintiff's attorney representing that the Administrator's earlier decision was based on "a lack of overall support

---

11. 7 C.F.R. Parts 1001, 1002, and 1004, respectively.

12. By regulation the scope of the hearing is determined by the Administrator of AMS. 7 C.F.R. § 900.3.

13. Letter from J. Patrick Boyle to Marvin Beshore (June 7, 1988).

from the majority of producer groups in both markets to NFO's accelerated producer payment proposals." [14]  The Assistant Secretary went on to state that

> [s]o long as this situation continues to exist, we feel it would not be appropriate to consider the proposals at a hearing. In this connection, it should be noted that our insistence on broad-based support from producers for the proposals in question is predicated in part on the statutory requirement that approval must be obtained from at least two-thirds of the affected producers in a market before any amended order can become effective.

At the same time, the Assistant Secretary encouraged plaintiff to present its views on the proposals included in the hearing notice calling for payments twice a month for Order 2 and to present "any appropriate modifications to them at the hearing."  As to Order 4, he emphatically stated that "[t]he payment issue, however, is not open with respect to the Middle Atlantic order." [15]

### III

█  Before proceeding to the merits, the Court will briefly review its basis for denying the Secretary's motion to dismiss.  The Secretary argues that his decision to exclude plaintiff's frequency of payment proposals is not reviewable by this Court be-

cause section 608c(3) of the AMAA by law commits such action to agency discretion. 5 U.S.C. § 701(a)(2).  The Supreme Court has held that review of an agency decision under the Administrative Procedure Act may not be had "if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."  *Heckler v. Chaney,* 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985).

In contrast to the statutory provision at issue in *Heckler,* both the present statute itself and the regulation promulgated thereunder provide clear parameters within which the Secretary must exercise lawful discretion and require reasoned decision-making.  Section 608c(3) provides that the Secretary must deny a hearing whenever he "has reason to believe that the issuance of an order will tend to effectuate" the AMAA's declared policy, and the regulation (7 C.F.R. § 900.3) adds, "or that for other proper reasons a hearing should not be held on the proposal."  Thus, the Secretary must have legitimate reasons, based on facts, to support his decision.  Indeed, the Court of Appeals for this Circuit has previously indicated that where the Secretary's decision is arbitrary, judicial review is available.  *See Marketing Assistance Program, Inc. v. Bergland,* 562 F.2d 1305, 1307 (D.C.Cir.1977), which states that the

---

**14.** Letter from Kenneth A. Gilles to Richard Green (June 30, 1988).

**15.** Based in part on this communication, the Department contends in its papers as it did at the preliminary injunction hearing that plaintiff cannot demonstrate irreparable harm because it "can move to raise th[e] issue [of frequency of payments for Order 4] from the floor" of the hearing, and it goes on to argue that "plaintiff could possibly prevail" and have its proposal heard.

As indicated above, the record shows that the Secretary shut out all consideration of plaintiff's proposal regarding Order 4.  Even as to Order 2, the Department's suggestion is more than a little disingenuous.  While plaintiff could in theory move to modify the frequency of payments proposal for Order 2 included in the notice of hearing, it is incredible that the Administrative Law Judge would grant the motion since the Secretary expressly excluded that very proposal from the notice of hearing. 7 C.F.R. §§ 900.7, 900.8.

In the same vein, the Department also argues that plaintiff cannot demonstrate irreparable harm because it is within the realm of possibility, however remote, that the Secretary could overrule an adverse decision by the Administrative Law Judge and order a special hearing on the NFO proposal for Order 2. 7 C.F.R. § 900.9 Even if that wholly implausible event occurred, the momentum of the original hearing would be lost.  Money damages could not provide the NFO relief from this immediate and certain injury.  *Virginia Petroleum Jobbers Association v. Federal Power Commission,* 259 F.2d 921 (D.C.Cir.1958).  Indeed, in terms of the relative injuries and hardships, it is obviously far easier for all concerned to delay the hearing for a few days and to correct the Secretary's error before that hearing ends rather than to take up everyone's time at or after the hearing while plaintiff may attempt to open or reopen it to the already excluded proposals.

Secretary "has the authority to determine the reasonable scope of a rulemaking proceeding and this court will not interfere unless that determination has been shown to be arbitrary and capricious."

## IV

██ Plaintiff challenges the Department's decision to exclude its frequency of payment proposal regarding Orders 2 and 4 as arbitrary and capricious on two different grounds. First, plaintiff asserts that the Department singled out its proposals for different treatment than that given to other proposals, holding them to a higher standard of support than the others,[16] and that, since other frequency of payment proposals were included in the notice of hearing, its proposals should also have been included. Second, plaintiff contends that the decision was premised, if it was premised on anything, on irrelevant communications with representatives for the milk handlers which have no say in amending the orders—only producers do.[17]

The Administrator of the AMS is required to make such investigation and give such consideration that he deems warrant-

**16.** The Department does not refute this contention, conceding that other proposals were not put to a pre-hearing support test, and that some of the proposals noticed have no observable supporters other than their sponsors.

**17.** Plaintiff also contends that the communications between the Secretary and the handlers were in violation of the law because they were ex parte. However, there is no merit to this contention since the applicable prohibition on ex parte contacts begins at the time of the issuance of the hearing notice, which in this case would be June 7, 1988. 7 C.F.R. § 900.16. All the communications complained of occurred before then.

**18.** Three orders are currently in effect that provide for payments three times per month. Indeed, as indicated above, as far as the milk orders at issue are concerned, the officials of the Dairy Division of the AMS, who have day-to-day responsibility for the administration of the milk marketing orders, included plaintiff's frequency of payment proposals in the hearing order. It is appropriate to infer from this action that the Dairy Division officials, at least, have concluded that plaintiff's proposals tend to promote the Act's policy.

ed regarding a proposal, and to deny the application only if he concludes that

' ... the proposed marketing order [or amendment] will not tend to effectuate the declared policy of the act, or that for other proper reasons a hearing should not be held on the proposal....

7 C.F.R. § 900.3. In this case, the Administrator did not find that plaintiff's proposal "will not tend to effectuate the declared policy of the [AMAA]." Obviously, trice monthly payments tend to support the Act, if only because several orders issued by the Secretary for other regions require the handlers to make payments to farmers that often.[18]

The Administrator deleted plaintiff's proposals essentially on the basis that they had very limited support in the industry.[19] As discussed below, there is no record to support that decision.

Subsequently, the Department contended, contrary to the language of the letter of June 7, that plaintiff's proposals had *no* support,[20] although this argument was later retracted.[21] At other stages, the Department adopted yet a third position—that plaintiff's proposals lacked identifiable support from a *majority* of producers.[22]

**19.** *See* letter of June 7, 1988 (note 13, *supra*). The Administrator declined to refer specifically to producers, leaving the possibility that when he used the term "industry," this included handlers. In his motions papers, the Department concedes that by the term "industry" the Administrator meant producer cooperatives *and* handlers. *See also*, Defendant's Motion to Dismiss, or in the Alternative, for Summary Judgment at 21 and 31 where it is stated that "the Administrator informed NFO ... a ⅔ vote by industry members, *i.e.*, coops and handlers, is required to approve a Marketing Order before it becomes effective." The Administrator is mistaken in this analysis because only the producers are relevant parties under the statute. *See infra.*

**20.** Defendant's Motion at 20 and 21.

**21.** Defendant's Reply to Plaintiff's Opposition to Defendant's Motion at 4.

**22.** Letter from Kenneth A. Gilles to Richard Green (June 30, 1988) and Defendant's Reply at 5.

## V

However these reasons are phrased, they are entirely unpersuasive.

First. There is no basis in the AMAA or its accompanying regulations for a majority or fifty percent threshold over which a proposal must pass before it can be considered at a hearing to amend a milk order. By law it only takes one-third of the producers to require the Department to hold a hearing on a proposed amendment. 7 U.S. C. § 608c(17). If one-third of the producers are able to mandate a hearing on their own motion, it would be wholly illogical to hold that the Department may require a greater showing of support when the question is only on the addition of proposals for a multi-issue hearing.

Second. The evidence presented by the Department does not support a finding that the majority of producers do not support plaintiff's proposals. The undisputed evidence is that the three largest producer organizations are unaware that any representative of their cooperatives had expressed to anyone at the AMS their opposition to the inclusion of plaintiff's proposals in the hearing notice.[23] In fact, these organizations favor including plaintiff's proposals, regardless of whether they would ultimately support, oppose, or take no position thereon.

To be sure, three organizations representing one-third of the producers in the New York–New Jersey region proposed two amendments to increase the payments to twice a month.[24] But a twice-a-month proposal is not necessarily in opposition to a three-times-a-month proposal. In any event, even if those sponsoring other proposals could not be persuaded at the hearing to cast their support for plaintiff's proposal, their numbers would not amount to a majority of the producers.[25]

As for the Mid–Atlantic region where no other proposals were made, the Department has offered no evidence on the question of which producers were contacted and what they stated in regard to plaintiff's proposals, although given ample opportunity to do so. The Department seems simply to have speculated that there was a lack of support for plaintiff's proposal, equating producer silence with non-support. The fact that other producers chose not to make the same or other proposals to amend the order regarding frequency of payments of course does not mean that they would not support a proposal made by another producer. A hearing is held precisely to arrive at ultimate conclusions concerning such subjects.

Third. The Department's argument that to notice plaintiff's proposals would jeopardize the future of these marketing orders is senseless. While it is true that an amended order is voted on in its totality, only those proposals which have support at the hearing sufficient to cause the Department to include them in the order are ever put to a vote. In other words, the Department has the power to keep a weakly supported proposal out of the amended order. Consequently, were plaintiff's proposals to prove at the hearing to be without substantial support, they could and would be kept out of the amended order before that order was ever issued.

Fourth. To the extent that the Department actually made contacts with "industry" representatives to ascertain the degree of support (*see* note 19, *supra*), they appear to have been, in whole or in part, from handler organizations rather than producer organizations. Indeed, the Department does not deny that it consulted handler organizations about plaintiff's proposals. Moreover, at least one organization has been so identified,[26] and its repre-

---

**23.** Pennmarva Federation, Dairylea Cooperatives, Inc., and Eastern Milk Producers Cooperative Association, Inc. imparted this information to plaintiff.

**24.** One proposal was submitted by the New York Farm Bureau and the other was submitted by Dairylea Cooperatives, Inc., and Eastern Milk Producers Cooperative Association, Inc.

**25.** The combined membership of these organizations is 6,400, while the total number of producers in the New York–New Jersey region is 14,-013.

**26.** The Milk Industry Foundation.

sentatives acknowledge that they lobbied the Department to delete plaintiff's proposal from the hearing notice. However, the sentiments of the handlers are not relevant when gauging support for a proposal to change a milk order since they have no say in the order's approval. For the Department to exclude plaintiff's proposal on the basis of the views of or pressure from the handlers was improper.

## VI

It is disturbing that the Department of Agriculture, in a patently arbitrary action, first, excluded from the present hearing on milk orders the proposals of the National Farmers Organization when it has included identical proposals from other organizations in other hearings; second, took the action solely or in part because of the opposition to the National Farmers Organizations of milk handlers, the antagonists of the producers on issues of this kind; and third, determined that the proposals made by the National Farmers Organization were not to be considered at the hearing because they lacked support when one of the purposes of the hearing is precisely to determine whether such proposals do have support. It is difficult to escape the conclusion that the Department of Agriculture's reasons for not wishing to have the proposals of the National Farmers Organization openly debated are unrelated to the statute and the regulations.

For the foregoing reasons, the Court concludes that the Secretary's decision to delete plaintiff's frequency of payments proposals from the draft notice of hearing was improper and without basis in fact. To remedy this violation, the Court is ordering the Secretary to include plaintiff's proposal in the hearing now being held. An order to that effect is being issued contemporaneously herewith.

## ORDER

Upon consideration of defendant's motion for summary judgment, the oppositions thereto, and the entire record herein, it is, for the reasons stated in the Opinion issued contemporaneously herewith, this 3rd day of August, 1988

ORDERED that the defendant's motion for summary judgment be and it is hereby denied; and it is further

ORDERED that summary judgment be and it is hereby granted to plaintiff; and it is further

ORDERED that the Secretary shall include plaintiff's frequency of payment proposals regarding milk Orders 2 and 4 in the hearing being held on Orders 1, 2, and 4; and it is further

ORDERED that the Secretary shall provide at least three days notice to all interested parties that plaintiff's frequency of payment proposals, regarding milk Orders 2 and 4, will be included in the hearing being held now on Orders 1, 2, and 4.