UNITED STATES of America, Plaintiff,

v.

SUNNY COVE CITRUS
ASS'N, Defendant.

DIST. I INDEPENDENT HANDLERS,
Plaintiffs,

v.

Edward MADIGAN, Secretary of
Agriculture, Defendant.

SUNNY COVE CITRUS ASS'N
et al., Plaintiffs,

v.

Michael ESPY, Secretary of
Agriculture, Defendant.

Nos. CV–F–91–311 OWW, CV–F–91–202
OWW and CV–F–92–5253 OWW.

United States District Court,
E.D. California.

April 18, 1994.

Catherine E. Basham, Asst. U.S. Atty.,
Fresno, CA, for U.S. Dept. of Agriculture,
Clayton Yeutter, Secretary of Agriculture,

Jack Parnell, Deputy Secretary of Agriculture, Jo Ann Smith, Asst. Secretary of Agriculture, Dan Haley, Administrator, Agricultural Marketing Services.

Daniel Bensing, Asst. U.S. Atty., Fresno, CA, for U.S., USA ex rel. Sequoia Orange Co.

Thomas E. Campagne, Clifford C. Kemper, The Law Firm of Thomas E. Campagne, Fresno, CA, for Sunny Cove Citrus Ass'n, District I Independent Handlers, Wileman Bros., Bee Sweet, Kings River Packing, Golden Farms Express, Inc., Douglas Hazeltine, Keith Gardner, David Hines.

James A. Moody, Washington, DC, for District I Independent Handlers, Abe–El Produce, Associated Citrus, Cal Valley Citrus, Citrus Producers, Inc., Dimare Co., Ecology Sound Farms, Fancher Creek Packing, J.C. Packing, Johnston Farms, Pandol Bros. Packing, Pleasant Valley Ranch, Rancho Del Sol, Sequoia Orange Co., Tanner Citrus, Valley Cove Ranch, Vista Del Mar Packing, Sun West, Lisle Babcock, Marvin L. Wilson, Carl A. Pescosolido, Jr., Sequoia Enterprises, Exeter Orange.

Brian C. Leighton, Clovis, CA, for District I Independent Handlers, Carol Mawood, Cecelia Packing, Eco Farms, M and CP Farms, Randolph Marketing, Suntreat Growers & Shippers, Johnston Farms, Dennis Johnston, Don Johnston, Jerry J. Johnston, World Wide Citrus, Bob Mawood, Stephen C. Biswell, Stanley Gillette, Stephen W. Miller, Lisle Babcock, Sequoia Orange Co., Saticoy Lemon Ass'n, Martin L. Wilson, Carl A. Pescosolido, Jr., Sequoia Enterprises, Sequoia Orange Co., Exeter Orange Co.

Robert Wilkinson, Donald R. Fischbach, Kendall Manock, Douglas M. Larsen, Lisa Marie Martin, Baker, Manock & Jensen, Fresno, CA, for Defendants Sunland Packing House Co., San Joaquin Citrus, Central Valley Citrus, Grand View Heights Citrus Ass'n, Lindsay Fruit Ass'n, Ivanhoe Citrus Ass'n, Tri County Citrus Ass'n, H & R Citrus, Baird–Neece Packing Corp., Sierra Citrus Ass'n, Klink Citrus Ass'n, Golden State Citrus, Magnolia Citrus Ass'n, Visalia Citrus Ass'n, Strathmore Co-op. Assn., Harding & Leggett, Inc., and Dole Citrus, Dick Isreal,

Vernon Noell, M.L. Thompson, Eldon Smith, Amos Fonville, Paul Storey, Robert Miller, Richard Peltzer, Blue Banner Citrus, Sunkist Growers, Helen Nicholas, Richard Nicholas, Frank Cement, Ronald Patterson, Ernest Thiesse, Tony Giefer, Harding & Leggett, Inc., Orange Cove–Sanger Citrus Ass'n, Porterville Citrus Assn., Inc.

Hilary Ann Chittick, Gerald D. Vinnard, Thomas, Snell, Jamison, Russell & Asperger, Fresno, CA, for Millwood Packing, Inc., David Krause, Sunland Packing House, Stark Packing Corp.

Steven R. Williams, Crowe, Williams, Jordan & Richey, Visalia, CA for Suntreat Growers & Shippers, Inc., Thomas A. Roberts, Ted Dinkler, Jr., William Slattery, Chester Stansell, Baker Brothers Sunkist Packing House, Oxnard Lemon Co., Kaweah Citrus Assn.

Dale V. Cunningham, Sunkist Growers, Inc., Sherman Oaks, CA, Sunkist Growers, Inc.

Ronald C. Peterson, Heller, Ehrman, White & McAuliffe, Los Angeles, CA, Sunkist Growers, Inc.

Michael H. Bierman, Jeffrey D. Wexler, Tuttle & Taylor, Los Angeles, CA, for Sunkist Growers, Inc., H & R Citrus Assn., Helen Nicholas, Richard Nicholas.

Harold A. Malkin, U.S. Dept. of Justice, Civil Div., Washington, DC, for USA ex rel. Sequoia Orange Co.

James S. Krzyminski, Washington, DC, for National Council of Farmers Cooperatives.

Robert M. Dowd, Griswold, LaSalle, Cobb, Dowd & Gin, Hanford, CA, for Orange Cove–Sanger Citrus Assn.

Richard J. Papst, Chain, Younger, Lemucchi, Cohn & Stiles, Bakersfield, CA, for Cal Citrus Packing Co., David Gauntlett, H.A. Luallen, Frank Rector.

## MEMORANDUM OPINION AND ORDER RE SUNNY COVE'S MOTIONS FOR SUMMARY JUDGMENT

WANGER, District Judge.

### I. *PROCEEDINGS*

On September 1, 1993, Sunny Cove Citrus Ass'n ("SC") filed the present motions for

summary judgment in each of the above un-consolidated cases.[1] SC contends that certain marketing orders, 7 C.F.R. §§ 907 & 908, governing California navel and Valencia oranges, and the facilitating regulations are invalid because the Secretary of Agriculture ("the Secretary") failed to comply with the requirements of the Administrative Procedure Act ("APA") in promulgating amendments to and regulations authorized by those marketing orders.

The U.S. filed its opposition on October 25, 1993. SC replied on November 8, 1993. On November 15, 1993, the Court heard oral argument on the motions and requested supplemental briefs on the following three issues: (1) the Secretary's source of authority for promulgation of disputed regulations for the 1985–1992 period; (2) the history and effect of the Secretary's rule making procedures in amending the marketing orders; and (3) whether harmless error applies.

Supplemental briefs were filed on November 22, 1993. In addition, the Orange Cove–Sanger Citrus Association filed an *Amicus Curiae* brief.

## II. *INTRODUCTION*

A review of the applicable administrative law principles and unique statutory scheme under which these disputes arise is necessary to decide these motions.

### *Procedural Requirements of the Administrative Procedure Act*

Under the APA, if a statute authorizes an agency to issue regulations which affect the legal rights of parties, the agency is required to follow the informal rule making procedures of 5 U.S.C. § 553. *See Rodway v. United States Dep't of Agriculture*, 514 F.2d 809, 813–14 (D.C.Cir.1975) ("*Rodway* "). Informal rule making often is referred to as "notice and comment" rule making. Section 553(b) provides:

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise

have actual notice thereof in accordance with law. The notice shall include—

(1) a statement of the time, place, and nature of the public rule making proceedings;

(2) reference to the legal authority under which the rule is proposed; and

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

Section 553(c) provides:

(c) After notice required by this subsection, the agency shall give interested persons an opportunity to participate in the rule making through submissions of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise statement of their basis and purpose.

5 U.S.C. § 553; *see Rodway*, 514 F.2d at 817 ("[a]fter consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose" that justifies the rules in light of the comments received).

An exception to these notice and comment procedures applies when "notice and public procedure ... are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(3)(B). To invoke this exception, an agency must incorporate a brief statement of its reasons for avoiding public participation in the final rule.

However, under 553(c), when the delegating statute requires that rules be made on the record after opportunity for an agency hearing, the agency must proceed under §§ 556 & 557 with formal rule making, the equivalent of trial. *See generally*, K. Davis, ADMINISTRATIVE LAW OF THE EIGHTIES § 6.3 ("ADMINISTRATIVE LAW"). Formal rule making may be required even if a hearing "on the record" is not expressly called for by the delegating statute. *See generally id.* at pp. 456–57.

---

**1.** These case are referred to, respectively, as: *United States v. Sunny Cove, District I Indepen-* *dent Handlers* and *Sunny Cove v. Espy.*

Conversely, a delegating statute that calls for a hearing does not necessarily require a trial-type proceeding under §§ 556 & 557. *See, e.g., United States v. Florida East Coast Ry.,* 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973) (statute that provided an agency "may, after hearing" issue rules, did not trigger formal rule making).

Under § 557(b), the agency may omit the initial or recommended decision and issue a tentative agency decision for public comment. *See* ADMINISTRATIVE LAW § 6.3; § 557(b). Under 556(d), the agency may substitute written submissions for oral testimony. *See* ADMINISTRATIVE LAW § 6.3; § 553(d).

Apart from the specific APA rule making procedures, intermediate rule making procedural models have developed which permit effective public participation while avoiding trial-type formal rule making proceedings. *See* E. Gellhorn and R. Levin, ADMINISTRATIVE LAW AND PROCESS IN A NUTSHELL, p. 330. This type of rule making is referred to as hybrid rule making. However, courts should not impose rule making procedures beyond those provided for by statute. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

### Judicial Review of Agency Action

5 U.S.C. § 706 of provides:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of the agency action. The reviewing court shall:

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

Under § 706(2)(E), the factual findings of the hearing officer must be upheld if supported by substantial evidence in the record. *Parchmen v. United States Department of Agriculture,* 852 F.2d 858, 863 (6th Cir.1988). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotations omitted). The substantial evidence test of § 706(2)(E) applies only when a formal trial-type hearing is required under §§ 556 and 557.

Under § 706(2)(A), however, agency action will be set aside as arbitrary and capricious if the agency lacked support in the administrative record for its factual assumptions or otherwise abused its discretion. *See Ass'n of Data Processing Service Organizations, Inc. v. Board of Governors of Federal Reserve System,* 745 F.2d 677, 683 (D.C.Cir.1984) ("*Data Processing*") (opinion by then Judge Scalia).

When the arbitrary or capricious standard is performing that function of assuring factual support, there is no substantive difference between what it requires and what would be required by the substantial evidence test ... *i.e.,* enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury.

*Id.* (quotations and citations omitted). The distinction between paragraphs (E) and (A) is that, as to closed record proceedings to which paragraph (E) exclusively pertains, substantial evidence must be found in the record. *Id.*

> [E]ven informal agency action (not governed by paragraph (E)) must be reviewed on the basis of the administrative record already in existence. But that is quite a different and less onerous requirement, meaning only that whether the administrator was arbitrary must be determined on the basis of what he had before him when he acted, and not on the basis of some new record made initially in the reviewing court. That administrative record might well include crucial material that was neither shown to nor known by the private parties in the proceeding.... It is true that in informal rulemaking, at least the most critical factual material that is used to support the agency's position on review must have been made public in the proceeding and exposed to refutation.

*Id.* at 684 (quotations and citations omitted).

Agency action which is supported by the required substantial evidence may nonetheless be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," for example, where there is an "abrupt and unexplained departure from agency precedent." *See id.* at 683.

### The Agricultural Marketing Agreement Act Marketing Orders

■ The Agricultural Marketing Agreement Act of 1937, as amended, 7 U.S.C. § 601 *et seq.* ("AMAA") delegates authority to the Secretary to issue marketing orders regulating the sale and delivery of various commodities, including oranges. *See Cecelia Packing v. USDA*, 10 F.3d 616 (9th Cir.1993). The AMAA was passed in response to unsta-

ble marketing conditions during the Depression, with the objective of helping farmers obtain a fair value for their agricultural products. *Pescosolido v. Block*, 765 F.2d 827, 829 (9th Cir.1985) ("*Pescosolido*"); 7 U.S.C. § 602. "The Act contemplates a cooperative venture among the Secretary, handlers,[2] and producers[3] the principal purposes of which are to raise the price of agricultural products and to establish an orderly system for marketing them." *Block v. Community Nutrition Institute*, 467 U.S. 340, 346, 104 S.Ct. 2450, 2454, 81 L.Ed.2d 270 (1984). One of the primary objectives of the AMAA is to establish and maintain parity prices for farmers. *Id.* at 830; *see also Schepps Dairy Inc. v. Bergland*, 202 U.S.App.D.C. 11, 628 F.2d 11, 19 n. 56 (1979); *Prune Bargaining Ass'n v. Butz*, 444 F.Supp. 785, 787–89 (N.D.Cal. 1975), *aff'd*, 571 F.2d 1132 (9th Cir.), *cert. denied*, 439 U.S. 833, 99 S.Ct. 113, 58 L.Ed.2d 128 (1978).

> The mechanism provided by 7 U.S.C. § 608c is the issuance of marketing orders, which may, under subsection (6), contain terms "(A) Limiting, or providing methods for the limitation, of the total quantity of any such commodity or product, or of any grade, size, or quality thereof, produced during any specified period or periods, which may be marketed in or transported to any or all markets * * * by all handlers thereof."

*Walter Holm & Co. v. Hardin*, 449 F.2d 1009, 1012 (D.C.Cir.1971); *see also Farmers' Alliance for Improved Regulation v. Madigan*, 1991 WL 178117 *3, 1991 U.S.Dist. Lexis 12208 *7 (D.D.C.1991) ("*FAIR*") ("Central to the Act is the 'marketing order' which is designed to advance the statutory policies of the AMAA, which are set forth in 7 U.S.C. § 602 (1933), as amended various times through 1970.").

---

**2.** Handlers are "processors, associations of producers, and others engaged in handling" oranges. 7 U.S.C. § 608c(1). Handlers pack, ship and market oranges. *See Wileman Bros. & Elliott, Inc. v. Giannini*, 909 F.2d 332, 333 (9th Cir.1990). Some producers of oranges, *i.e.*, growers, may also handle oranges. *See id.*

**3.** Growers produce commodities which are regulated by the terms of marketing orders promulgated under the AMAA. *See Farmers' Alliance for Improved Regulation v. Madigan*, 1991 WL 178117 *3–4, 1991 U.S.Dist. Lexis 12208 *10 (D.D.C.1991). Growers also may be handlers within the meaning of 7 U.S.C. 608c(1). *See Wileman Bros. & Elliott, Inc. v. Giannini*, 909 F.2d 332, 333 (9th Cir.1990); *see, supra*, note 2.

Under 608c(3), in issuing or amending [4] an order, the Secretary must conduct a "hearing" on the contemplated order or amendment.[5] *See Cecelia Packing*, 10 F.3d at 618. ("Marketing orders may be issued only after the Secretary complies with the Act's detailed promulgation procedures. The Secretary must first give notice and an opportunity for a hearing upon any proposed order.") (citation and quotations omitted); *Sequoia Orange Co. v. Yeutter*, 973 F.2d 752, 755 (9th Cir.1992), *amended, reh'g denied*, 985 F.2d 1419 (9th Cir.1993) (*"Sequoia"*) ("The Secretary acknowledges that notice and a hearing are required before the issuance of an amendatory order.") (discussed *infra*).

"[S]ection [60]8c(4) of the [AMAA] requires that in issuing an order the Secretary shall find upon the evidence introduced at the promulgation hearing, that the issuance or amendment of the order 'and all the terms and conditions thereof' will tend to effectuate the declared policy of the act." [6] *United States v. Mills*, 187 F.Supp. 314, 317 (D.Md. 1960); *see National Farmer's Organization, Inc. v. Lyng*, 695 F.Supp. 1207, 1208 (D.D.C. 1988) (under § 608c(3) whenever the Secretary has reason to believe that the issuance of an amended order will tend to effectuate the declared policy of the AMAA he shall give notice of and an opportunity for a hearing ... the Secretary issues an amended order, if he finds, and sets forth in the order, upon evidence introduced at such hearing, that the issuance of the amended order will tend to effectuate the policy of the AMAA).

Whether the issuance and amendment of marketing orders are subject to formal or informal rule making procedures under the APA, or something in between, has not, however, been consistently determined by federal courts. *Compare Farmers Union Milk Marketing Coop v. Yeutter*, 930 F.2d 466, 467 (6th Cir.1991) (under 7 U.S.C. § 608c(3) & (4) of the AMAA, the Secretary can promulgate marketing orders only after formal on-the-record rule making); *American Dairy v. Bergland*, 201 U.S.App.D.C. 266, 627 F.2d 1252, 1254 (1980) (marketing orders under 7 U.S.C. § 608c of the AMAA are issued in formal rule making proceedings with prior notice and a hearing); *United States v. Mills*, 187 F.Supp. 314, at 315, 317 nn. 2 & 3 (D.Md.1960) (order was issued after "the usual notice, public hearing, briefs, recommended decision, exceptions to the recommended decision, final decision, including findings and conclusions, and a producer referendum;" i.e., formal rule-making which must be supported by and in accord with substantial record evidence) and *Marketing Assistance Program, Inc. v. Bergland*, 183 U.S.App.D.C. 357, 562 F.2d 1305, 1306–07 & 1309 (1977) (plaintiff conceded an order was supported by substantial evidence, but the court reasoned that while marketing orders are referred to as orders, they are "really instances of notice and comment rulemaking" and hearings are not required by statute to be "on the record" because the AMAA does not use the words "on the record" or their equivalent). Nonetheless, § 608c(4)'s direction that the Secretary's determination be based on the evidence adduced at a hearing has "consistently been interpreted to mean that the factual predicate for the order must be grounded in substantial record evidence." *Schepps Dairy Inc. v. Bergland*, 628 F.2d at 22; *accord Jones v. Bergland*, 456 F.Supp. 635, 646 (E.D.Pa.1978).

If, after the hearing, the Secretary finds the issuance of the order will tend to effectuate the declared policy of the Act, the Secre-

---

**4.** 7 U.S.C. § 608c(17) provides that the provisions of §§ 608c and 608d applicable to marketing orders are applicable to amendments to such orders, and provides when a hearing may be called.

**5.** 7 U.S.C. §§ 608c(3) provides that:
Whenever the Secretary of Agriculture has reason to believe the issuance of an order will tend to effectuate the declared policy of this title ... he shall give due notice of and an opportunity for a hearing upon a proposed order.

**6.** 7 U.S.C. § 608c(4) provides:
After such notice and opportunity for hearing, the Secretary of Agriculture shall issue an order if he finds, and sets forth in such an order, upon evidence introduced at such hearing (in addition to such other findings as may be specifically required by this section) that the issuance of such order and all of the terms and conditions thereof will tend to effectuate the declared policy of this title with respect to such commodity.

tary issues a final decision on the proposed order. § 608c(4). However, § 608c(8) provides that no order as to California citrus fruits will be effective until (1) handlers of 80% of the volume have signed a marketing agreement, pursuant to 608b, regulating the oranges in the same manner as the marketing order and (2) either three-quarters of the producers of oranges or producers of two-thirds of the volume of oranges approve the Secretary's determination by referendum vote. 7 U.S.C. § 608c(8); *see FAIR*, 1991 WL 178117 *5, 1991 U.S.Dist. Lexis 12208, *14 ("An order with a marketing agreement can become effective upon the assent of 80% of 'handlers,' as defined in the AMMA, together with 75% of growers."). Under § 608b the Secretary has the power, after due notice and a hearing, to enter into such marketing *agreements* with orange *handlers*. 7 U.S.C. § 608b(a). These agreements are exempt from antitrust laws. *Id.*

Under § 608c(9), however, if handlers do not enter into the marketing agreement upon which the hearing has been held, the Secretary may waive the necessity for *handlers'* assent and proceed with a referendum to enact a rule or modification (without a marketing agreement) upon the vote of three-fourths of the *producers*. 7 U.S.C. § 608c(9); *see FAIR*, 1991 WL 178117 *12, 1991 U.S.Dist. Lexis 12208, *14. "[A]n order becomes effective [pursuant to 608c(9) ] when ... the Secretary determines that the refusal or failure of handlers to sign such an agreement tends to prevent the effectuation of the policy of the [AMAA], and that issuance of the order is the only practical means of advancing the interests of producers...." *Wileman Bros. & Elliott, Inc. v. Giannini*, 909 F.2d 332, 334 (9th Cir.1990) ("*Wileman*")

While producer approval is required to issue a marketing order, the Secretary is not required to conduct a referendum to obtain *producers'* approval of an *amendatory* order. *See* 7 U.S.C. § 608c(19). Nonetheless, this method customarily is used.

Under § 608c(16)(A) ("16(A)"), the Secretary *shall terminate or suspend* the operation of a marketing order, or any provision thereof, at any time if he or she finds that it obstructs or fails to effectuate the declared policy of the AMAA. 7 U.S.C. § 608c(16)(A) (emphasis added). Under § 608c(16)(B) ("16(B)"), Congress also delegated to the producers the power to vote on whether marketing orders or marketing agreements should be terminated. *See Cal–Almond, Inc. v. USDA*, 960 F.2d 105, 110 (9th Cir.1992). The Secretary shall terminate a marketing order or marketing agreement whenever he finds the termination is favored by a majority of the commodity's producers. *Id.* at 107 ("In any referendum conducted pursuant to the [AMAA] it is producers rather than handlers who are entitled to vote."). Thus, if an order is detrimental to producers' interests the AMAA provides an adequate remedy, in that a simple majority of producers may vote to terminate the order or agreement, less than the amount required to approve an order. *Pescosolido*, 765 F.2d at 830. *But see* 7 C.F.R. §§ 907.83 & 908.83.[7]

The AMAA does not set forth the procedures for the conduct of referendum voting, "but surely implicit in the Act is the expectation that the Secretary would adopt procedures that are consistent with an open democratic process." *Id.* Recently, the Ninth Circuit held that the "bloc voting" requirement set forth in § 608c(12) does not does not violate constitutional rights of free speech and equal protection. *Cecelia Pack-*

---

**7.** To determine whether continuance is favored by producers, the required percentages set forth in the act with respect to producer approval of the issuance of a marketing agreement and order ... shall be used. In the event that a referendum is utilized to aid in making this determination, such required percentages for continuance shall be held to be complied with if ... the percentage favoring continuance is equal to or in excess of the percentage required.

   7 C.F.R. § 907.83(c)(2) (navel oranges); 7 C.F.R. § 908.83(c)(2) (Valencia oranges) (same language).

Under § 608c(16)(B), only a simple majority of the producers is required to continue a marketing order. *Pescosolido*, 765 F.2d at 830. New orange marketing orders may be issued only if approved by 75% of the producers. § 608c(8). "[T]he [AMAA] makes clear that 75% of voting producers must agree to any modification." *FAIR*, 1991 WL 178117 *10, 1991 U.S.Dist. Lexis 12208 *34 (citing 608c(9)).

*ing,* 10 F.3d at 625. Section 608c(12) provides that, whenever the Secretary is required pursuant to 608c to determine the approval or disapproval of producers with respect to the issuance of any order, the Secretary must consider the vote of a producer cooperative association in a marketing order referendum as representing all the association's member-producers. *See* 7 U.S.C. § 608c(12).

Unlike 16(B), termination or suspension under 16(A) does not require producer approval. *See Western Dairymen Coop., Inc. v. Yeutter,* 1990 U.S.Dist. Lexis 3950 *20 (D.D.C.1990) (*"Western Dairymen"*). The Secretary is not required to hold a hearing before terminating or suspending an order or provision thereof. *See id.* at *15; *see* 608c(16)C.

### Regulations

Marketing orders 7 C.F.R. §§ 907 & 908 closely regulate the domestic marketing of orange crops. *See FAIR,* 1991 WL 178117 *3–4, 1991 U.S.Dist. Lexis 12208, *10; *see also Wileman,* 909 F.2d at 334 ("The [AMAA] provides for marketing orders as the means by which the Secretary is to promulgate regulations."). Marketing orders regulating California and Arizona navel and Valencia oranges have been enforced since 1954. *See Cecelia Packing,* 10 F.3d at 618. A major objective of these orders is to adjust the short-term supply of oranges to meet market conditions, which are subject to wide short-term variations.

■ Under the marketing orders, regulations may be promulgated by the Secretary upon a finding that such regulations will tend to effectuate the policies of the AMAA. *See Wileman,* 909 F.2d at 335. Historically, the

Secretary has used a series of short-term regulations promulgated under the marketing orders in order to stabilize the orange market:

This regulation takes place through week-by-week control over the volume of each type of fruit shipped in interstate commerce, in any week for which the Secretary determines that such volume regulation will advance the purposes of the Act. The amount of fruit which can be shipped in a given week is set by the Secretary, acting with the advice of the relevant Administrative Committee.[8] These volume restrictions, called interchangeably "allotment" or "prorate," are imposed on a district-by-district (the California–Arizona production area is divided into three "prorate districts," 7 C.F.R. § 907.66) and handler-by-handler basis in order to ensure that no region or handler ships an amount of fruit disproportional to the amount the Secretary has decided should be allotted to that region or handler for a given week.

*FAIR,* 1991 WL 178117 *4, 1991 U.S.Dist. Lexis 12208, at *11.

■ The promulgation of prorate regulations must comply with the informal rule making procedures of the APA. *Riverbend Farms, Inc. v. Madigan,* 958 F.2d 1479, 1484 (9th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 598, 121 L.Ed.2d 535 (1992) ("*Riverbend*") (discussed *infra*).

### Procedures for Review of Agency Action under the AMAA

Section 608c(15)(A) ("15(A)") provides that any handler may petition the Secretary for relief from any provision of an order believed

---

**8.** The composition, duties, and powers of the Orange Administrative Committees are set forth in the marketing orders issued by the Secretary based on marketing *agreements* with the *handlers* subject to a referendum of *producers. Wileman,* 909 F.2d at 333.

The navel orange order, like other marketing orders, requires the formation of a Committee "consisting of 11 members, for each of whom there shall be one alternate, and for each grower and handler member an additional alternate." 7 C.F.R. § 907.20. The marketing order specifies in detail the way that potential members are nominated (7 C.F.R. § 907.22)

and selected (§ 907.23), as well as the powers (§ 907.28) and duties (§ 907.29) of the Committee....

The Committees have a variety of responsibilities, and are intended to relieve the Secretary of much of the day-to-day burden of administering the marketing orders. Of relevance among these responsibilities is that pursuant to both statute (7 U.S.C. § 608c(7)) and regulation, the Committees have the power to "recommend to the Secretary amendments" to the marketing order they administer.

*FAIR,* 1991 WL 178117 *4, 1991 U.S.Dist. Lexis at *12–13.

to be "not in accordance with law." 7 U.S.C. § 608c(15)(A). An Administrative Law Judge ("ALJ") first reviews the order, subject to review by the Secretary. *See* 7 C.F.R. § 900.50–64; who has delegated statutory review authority to the Judicial Officer ("JO") of the USDA. *See id.* § 900.65–71; 38 Fed.Reg. 10, 795 (1973); 37 Fed.Reg. 28,475 (1972).

Section 608c(15)(B) ("15(B)") gives the district court jurisdiction to review the JO's ruling. 7 U.S.C. § 608c(15)(B). Section 15(B) authorizes the reviewing court to "remand such proceedings to the Secretary with directions either (1) to make such ruling as the court shall determine to be in accordance with the law, or (2) to take such further proceedings as, in its opinion, the law requires," if the court determines that the JO's ruling is not in accordance with the law. *Id.*

However, at least one court has observed that:

> The AMAA provision which gives handlers a cause of action which requires that they first pursue administrative remedies does not apply to suspension orders. 7 U.S.C. §§ 608c(15), 608c(16)(C). Thus, the AMAA does not give handlers a primary role in challenging suspension orders.

*Western Dairymen,* 1990 U.S.Dist. Lexis 3950 *17 (interpreted AMAA as not precluding producers' challenge to Secretary's suspension order). *But see Pescosolido,* 765 F.2d at 831 (judicial review generally foreclosed to anyone other than handlers).

■ *Pescosolido* addressed whether mandamus could be invoked to compel the Secretary to make findings that marketing order 907 should be terminated. *Id.* Growers urged the district court to ·make its own findings that marketing order 907 should be terminated and to terminate the order if necessary. *Id.* The Ninth Circuit concluded that this alternative was not available to the growers:

> Although the Secretary is commanded by section 608c(16)(A) to terminate any order which "obstructs or does not tend to effectuate" the Act's policy, this command only

applies *after* the Secretary makes findings indicating such a failure.

*Pescosolido,* 765 F.2d at 830.

> [Section 16(A) ] is mandatory as a literal matter; it says the Secretary "shall" terminate or suspend "whenever he finds" the prescribed conditions. Since it is his finding that controls, it would appear that a large measure of discretion is given him on this as on other subjects. It is doubtful, however, whether his exercise of this discretion, or failure to exercise it, is wholly unreviewable.

*Foster v. Freeman,* 271 F.Supp. 33, 40 n. 5 (S.D.N.Y.1967). A court does not initiate the findings necessary to terminate a marketing order, but properly reviews whether the Secretary has complied with the procedural requirements of the AMAA and APA to "reinstate" marketing orders after making a contrary tendency finding. *Cf. Sequoia,* 973 F.2d at 756. (Judicial review proper to determine APA and AMAA compliance in amending marketing orders.)

Proceedings under § 15 "shall not impede, hinder, or delay the United States from obtaining relief pursuant to [§ 608a(6) ]." *Id.* Section 608a(6) vests the district courts "with jurisdiction specifically to enforce, and to prevent and restrain any person from violating an order, regulation or agreement ... made or issued pursuant to [Title 7]." 7 U.S.C. § 608a(6).

### III. CASES SUBJECT TO THE PRESENT SUMMARY JUDGMENT MOTION

#### United States v. Sunny Cove

The U.S. sued SC under §§ 608a(5)–(7) of Title 7 for, *inter alia,* civil forfeitures for overshipment of naval and Valencia oranges in violation of prorate regulations during the 1985–86 through 1987–88 seasons from misreporting uncovered by Navel Orange Administrative Committee ("NOAC") audits. SC is alleged to have filed over 1000 false statements with NOAC. The action seeks to enforce, and to restrain violation by SC of the AMAA, marketing orders 907 and 908, and implementing prorate regulations. SC's affirmative defenses include the invalidity of

the marketing orders and prorate regulations.[9]

### District I Independent Handlers

This 15(B) action, brought by SC and other handlers, challenges, *inter alia*, the legality of orange prorate regulations during the 1986–87 through 1989–90 seasons, on the ground that the Secretary invalidly promulgated those regulations.

### Sunny Cove v. Espy

This 15(B) suit challenges marketing orders 907 and 908 based on the 1992 *Sequoia* decision and the Secretary's actions to terminate rule making proceedings and "reinstate" the pre-amendment marketing orders.[10] SC contends all orange marketing orders are invalid, retroactive to 1985 and seeks to revisit the issue of retroactive application of the *Sequoia* decision, in light of *Harper v. Virginia Dep't of Taxation,* — U.S. ——, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993) ("*Harper*").

## IV. BACKGROUND

### Rule Making Applicable to Prorate Regulations: The Riverbend Litigation

In 1984, SC and other handlers sought to invalidate weekly prorate regulations promulgated since the 1974–75 marketing season, which led to the 1992 *Riverbend* decision. *See Decision and Order* (filed April 23, 1987), p. 1 (SC's Ex. 1). On April 23, 1987, the ALJ overturned the prorate regulations promulgated from 1979 to January 31, 1985, for APA, Marketing Order 907, and AMAA noncompliance.[11] The JO reversed and SC filed a 15(B) action.

SC advanced eight separate grounds to invalidate the weekly volume regulations. In

*Riverbend v. Yeutter,* CV–F–88–98 EDP (1989), the district court, on June 1, 1989, ruled in SC's favor on only one claim; that the Secretary and NOAC did not comply with the notice and comment provisions of § 553 in promulgating weekly prorate regulations. The Court, however, found no harm:

> All of the seasons which have been put in issue have since passed. Plaintiffs have presented no evidence that but for the violation of the notice and comment requirements, the marketing orders would have resulted in different shipping restrictions in the marketing orders. Consequently, plaintiffs have not proven any damage suffered by them.

Judge Price "remand[ed] the matter to the Secretary to enter an order requiring [NOAC] to comply with the provisions of 5 U.S.C. § 533(b) or alternatively, when [NOAC] determines that compliance with that section may be waived, to make findings of fact that justifies a waiver of such requirement as provided in 5 U.S.C. § 553(b)(3)(B)."

On June 13, 1989, the Secretary moved to alter, amend, or stay the judgment. While these motions were pending, the 1989–90 navel orange season arrived. On November 3, 1989, the Secretary published the first prorate regulation, followed by NOAC's November 7, 1989, statement:

> Note that Judge Price stated that compliance with the notice provision (5 U.S.C. section 553(b)) may be waived if findings of fact are made that justify the waiver. Those findings are being made and will be made throughout the season while regulations are in effect.

SC sought contempt against the Secretary which was denied December 11, 1989, because there, "is no final judgment in this

---

9. The U.S. contends that a court can rule on the legality of a marketing order requirement only in a challenge to such a requirement brought under the applicable provision of the AMAA, 7 U.S.C. § 608c(15)(B), after a final agency decision on the underlying administrative petition, 7 U.S.C. § 608c(15)(A). In the present case, the U.S. concedes that because the issues presented are all raised in SC's pending (15)(B) motions, the district court has jurisdiction.

10. The term, pre-amendment marketing orders, is used to refer to marketing orders 907 and 908

as they existed immediately prior to improper amendment in 1984.

11. There was no evidence sufficient in the record to establish departmental practices before 1979. At the time of the hearing, no volume regulation had been in effect since January 31, 1985, when it was found that the 1984–85 season would be substantially above parity, a fact that required the Secretary to end price maintenance actions. *See* April 23, 1987 *Decision and Order,* p. 18 nn. 7 & 8.

matter. The defendants' Motion for Reconsideration is still under consideration." The motions were denied by final order of March 22, 1990. The Secretary appealed. The appeals court stayed the judgment May 11, 1990.

On June 27, 1990, the ALJ, on a stipulated record, invalidated the 1986–1989 prorate regulations for noncompliance with APA notice and comment requirements, by failure to afford meaningful opportunity to participate in the rule making process. Orange industry meetings provided insufficient opportunity to comment. The ALJ's decision indicated that the Secretary's marketing policies, which never became part of the official record, could not be considered as part of the USDA's basis and purpose statement. *See Decision and Order* (filed June 29, 1990), pp. 25–31 (SC's Exhibit 33) (citing *Rodway v. United States Dep't of Agriculture*, 514 F.2d 809, 817 (D.C.Cir.1975) (only the administrative record may be examined to determine compliance with § 553, and unsigned, undated, unpublished analyses are not part of the record)).

On March 29, 1991, the JO reversed the ALJ's decision. The *District I Independent Handlers* 15(B) action followed. It challenges, *inter alia*, the legality of 1986 through 1990 naval orange prorate regulations.

On March 17, 1992, *Riverbend* held the Secretary's procedure for promulgating weekly prorate regulations for navel oranges did not comply with § 553 of the APA, for failure to demonstrate good cause for not giving sufficient notice in the Federal Register of the weekly NOAC meeting and failure to allow the public other means to comment.[12] 958 F.2d at 1487. This conclusion, according to the Court,

> though important for how the Secretary must regulate the navel orange markets in the future, does not answer the question of most concern to the parties in this case: the remedy. We must decide what effect the Secretary's failure to comply with notice and comment requirements carries for

past weekly volume restrictions. If we invalidate past volume restrictions, plaintiffs would obviously succeed in the pending forfeiture proceedings brought against them by the Secretary.

*Id.* at 1487. The Ninth Circuit held APA noncompliance was harmless error, and declined to invalidate "the volume restrictions issued in the past by the Secretary." *Id.* at 1488. The Ninth Circuit reasoned that the parties had been aware of the NOAC meetings at which they could comment:

> Though we disapprove the Secretary's continued reliance on the good cause exception to abandon APA procedures altogether, his failure to do so in the past *cannot serve to invalidate old volume restrictions.*

On remand, the district court shall give the Secretary an appropriate period to comply with this opinion—at the latest by the time the Secretary begins imposing weekly volume restrictions for the 1992–93 navel orange season.

To summarize, the Secretary must:

> (1) publish an advance notice of the Tuesday NOAC meetings in the Federal Register, preferably at least a week ahead of time, which should include the time and place of the NOAC meeting, the legal authority for the proposed restriction and a tentative projection of the volume restriction for the week to follow the meeting; and

> (2) allow parties to submit written comments to the NOAC and the Secretary in lieu of or in addition to permitting oral participation at the NOAC meeting.

*Id.* at 1489 (emphasis added) (quoted with approval and followed in *Cal–Almond, Inc. v. USDA*, 14 F.3d 429, 441–42 (9th Cir.1993) ("*Cal–Almond*")).

### Invalidation of Amendments to the Marketing Orders: the Sequoia Litigation

The events which led to the Sequoia decision began with the USDA's March 17, 1983, pronouncement in the Federal Register that it was considering amending both the Valen-

---

**12.** The sole issue appealed by the Secretary to the Ninth Circuit was whether the prorate regulations violated § 553 of the APA.

cia and navel orange marketing orders. 48 Fed.Reg. 11,276 (1983). After public hearings and receipt of comments, the Secretary issued a recommended decision proposing to adopt 21 amendments to the orange marketing orders. 49 Fed.Reg. 14,360 (1984) (proposed April 11, 1984). The recommended decision included a preliminary "tendency finding" that the orders, with the proposed amendments, will tend to effectuate the declared policy of the AMAA. *Id.* at 14,372.

The Secretary issued a proposed rule to amend the marketing orders on July 12, 1984, published in the Federal Register July 18, 1984. 49 Fed.Reg. 29,071 (1984). The rule included the "tendency finding" that "said order[s], as amended and as hereby further amended, ... will tend to effectuate the declared policy of the act." *Id.* at 29,088, 29,094. The proposed rule announced a "package" voting procedure for producer approval of marketing orders. The Secretary explained that "the referendum ballot shall provide only for the approval or disapproval of the [marketing] orders as amended and as proposed to be amended." *Id.* at 29,088. A negative vote on the entire package would have constituted complete refutation, not only of the proposed amendments, but of the pre-existing marketing orders as well, which would have left the orange market unregulated. That proposed rule stated that "[t]his order shall not become effective unless and until the requirements of [7 C.F.R.] § 900.14 ... governing proceedings to formulate marketing agreements and orders have been met." 49 Fed.Reg. at 29088, 29094.

Before the vote, some growers and a major handler successfully lobbied the Secretary and Congress for a change in the voting procedures, *see Sequoia,* 973 F.2d at 754 n. 2., 758 n. 5, and the Secretary reversed his decision on "package" voting. On August 8, 1984, without any notice and comment procedures, the USDA published a notice in the Federal Register amending the proposed referendum order, "to permit producers to vote on each of the proposed amendments." 49 Fed.Reg. 32,080 (1984). This voting procedure left the pre-amendment marketing orders in effect regardless of the outcome of the vote.

When the vote was taken, thirteen of the Valencia order amendments and fifteen of the navel order amendments were ratified. 50 Fed.Reg. 1429 (1985) (codified at 7 C.F.R. §§ 907, 908). The final rule, amending marketing orders 907 and 908, was published in the Federal Register January 11, 1985, and contained the finding, made without opportunity for notice or comment, that, "said orders as amended, will tend to effectuate the declared policy of the AMAA." *Id.* The 1985–1992 prorate regulations were promulgated under these amended marketing orders.

On June 28, 1985, Sequoia filed a 15(A) petition, challenging the validity of the amended Valencia[13] order. On September 27, 1987, the ALJ invalidated the change in referendum voting procedures for the amendment because it was not based on stated reasons showing its purpose and was tainted by improper considerations. *See Sequoia,* 973 F.2d at 755. The final rule resulting from the referendum also was invalid. *See id.* The JO reversed and upheld the referendum procedure as a "discretionary matter of agency procedure."

On February 6, 1989, Sequoia filed a 15(B) action, claiming the amended Valencia order was invalid because: (1) line-item voting on the amendments violated the AMAA; (2) the voting scheme was unconstitutional; (3) the Secretary's decision to change the voting procedures was arbitrary and capricious; and (4) the new voting procedures did not comply with the requirements of the APA.

On November 28, 1990, in *Sequoia v. Yeutter,* CV F–89–632 EDP, 1990 WL 429847 (E.D.Cal.1990), the district court held the amendments to the marketing order unlawful because the Secretary's *change* in the referendum voting procedures was made without compliance with APA *notice and comment* rule making provisions. *Id.* (emphasis added). The decision "invalidated the amended

---

**13.** While the proposed amendments, the public hearings and the two referenda all dealt with both the Valencia and navel orange marketing orders, Sequoia challenged only the validity of the Valencia order in *Sequoia v. Yeutter.* Nonetheless, the identical issues are presented with respect to the navel order.

marketing order and left it to the Secretary to decide how to proceed." *Sequoia,* 973 F.2d at 759.

The "district court's decision to invalidate amendments to a marketing order because the Secretary did not comply with the [APA]," was affirmed by the Ninth Circuit, who "agree[d] with the simple approach of the district court in this complex case." *Id.* at 754, 755. The Court observed: "The Secretary acknowledges that notice and a hearing are required before the issuance of an amendatory order." *Id.* at 755. The Secretary argued, however, that because the language in the AMAA itself only states that "the Secretary may conduct a referendum" to determine grower approval under 7 U.S.C. § 608c(19) and does not include any statutory language limiting the Secretary's discretion, the referendum procedures are delegated solely to the Secretary's discretion.[14] *Id.* The appeals court held the Secretary's statement in the Federal Register and decision to amend the marketing order was APA rule making, which bound the Secretary to follow the APA's procedural dictates. *Id.* at 757 (citing *Arlington Oil Mills, Inc. v. Knebel,* 543 F.2d 1092, 1095 n. 6 (5th Cir.1976) ("*Arlington* ") (price support program arguably is exempt from the rule making requirements of the APA under § 553(a)(2), however, since USDA voluntarily agreed to comply with APA in such matters and concedes it is bound by its own regulation it must comply with the APA) and *Rodway,* 514 F.2d at 814 (USDA regulation making the procedural re-

quirements of the APA applicable to all rule making relating to public property, loans, grants, benefits, or contracts has force and effect of law, thus binds the Secretary to comply with APA procedures in promulgating allotment regulations)).[15]

The change in procedure to allow individual votes on each amendment required the Secretary to make a proper § 608c(4) tendency finding. *Sequoia,* 973 F.2d at 758. The Secretary initially had opted for the all-or-nothing "package" voting in order to give effect to his "tendency finding" that the marketing order as amended by *all* 21 amendments would effectuate the purpose of the AMAA. *Id.* By changing the voting procedure, the Secretary disregarded the tendency finding made in his proposed order. *Id.*

The *Sequoia* Court disagreed with the JO's conclusion the referendum was a discretionary matter of agency procedure: "The vigorous objection to the voting procedure originally decided upon illustrates that the referendum procedure was an important part of the entire proposal to amend the marketing orders and not merely a procedural nicety." [16] *Id.* at 759. The Secretary was bound to follow the APA in reversing his original decision, *id.:*

> The procedural safeguards of the APA help ensure that government agencies are accountable and their decisions are reasoned. *See American Bus Ass'n v. United States,* 627 F.2d 525, 528 (D.C.Cir.1980); [17] *Rodway v. United States Dep't of Agriculture,* 514 F.2d 809, 817 (D.C.Cir.1975)

---

**14.** Under § 701(a)(2), an action "committed to agency discretion by law" is exempt from review under the APA.

The AMAA does not require the Secretary to conduct a referendum to obtain producers' approval of an *amendatory* order. *See* 7 U.S.C. § 608c(19). The Secretary may proceed with a producer referendum to enact a rule or modification even if handlers do not enter into a marketing agreement. 7 U.S.C. § 608c(9).

**15.** Agency agreements are contracts, and the APA does not apply to matters "relating to agency management or personnel or public property, loans, grants, benefits or *contracts.*" 5 U.S.C. § 553(a)(2) (1988) (emphasis added). In 1971, however, the USDA promulgated a regulation making the APA's procedural requirements appli-

cable to all of its rule making relating to contracts. 36 Fed.Reg. 13,804 (1971).

*Cal–Almond,* 14 F.3d at 446 n. 17.

**16.** Internal "procedural" rules are not subject to notice and comment provisions of the APA. *See* 5 U.S.C. § 553(b)(A). The Ninth Circuit observed that the [amended] marketing order had a direct impact on the activities of the handlers. 973 F.2d at 755 n. 3.

**17.** (the principal purpose of § 553 is to provide public participation upon notice; pronouncement issued by Interstate Commerce Commission, intended to lessen constraints imposed upon motor carriers was substantive rule, unlawful in absence of compliance with notice and comment procedures of APA, 627 F.2d at 526, 528).

(APA's purpose is to cause agency to respond to comments in a reasoned manner and explain how agency resolved problems). These safeguards should have been observed in this case.

*Id.* at 758. The Court remanded to permit the Secretary to proceed in accordance with the notice and comment provisions of the APA. *Id.* at 759.

The Secretary's response was a September 15, 1992, press release that announced termination of the rule making proceeding to amend the navel and Valencia orange marketing orders and a declaration the pre-amendment marketing orders would continue in effect unamended. The release stated that the pre-amendment marketing orders "continue to effectuate the purposes of the AMAA." USDA Press Release (Sept. 15, 1992).

On October 5, 1992, Sequoia sought a rehearing requesting the Ninth Circuit review Sequoia's contention "there presently is no marketing order in effect." On March 3, 1993, the Ninth Circuit amended its opinion by deleting the sentence, "The [Secretary's] decision also indicated that without these amendments the marketing order should be terminated," and substituted the following language:

> The decision adopted an all-or-nothing approach to the slate of amendments and *made at least an implicit value judgment* that without the amendments the marketing order should be terminated.

985 F.2d 1419 (emphasis added).

### The Stark Decision

In January of 1989, Sequoia Orange, acting as Relator pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730, filed a complaint against Stark Packing Co. ("Stark"), and Sunkist Growers, Inc. ("Sunkist"), alleging that Stark, with the aid of Sunkist, violated the navel orange marketing order during the 1987–88 [18] growing season by shipping oranges in excess of its prorate.

The Court bifurcated the summary judgment motion to first resolve issues raised by the *Sequoia* decision: (1) whether the opinion invalidated the orange marketing orders, not just the 1985 amendments; (2) whether the decision applied retroactively to 1984, or prospectively only; and (3) whether the September 15, 1992, pronouncement that the [pre-amendment] marketing orders "will continue in effect without the 1985 amendments" was valid agency action.

In December 1992, this Court held: (1) *Sequoia* did not invalidate the pre-amendment marketing orders,[19] but only the 1985 amendments; and (2) that *Sequoia* applied prospectively only,[20] applying the *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), factors (*"Chevron Oil"*). Following that decision, the U.S. Supreme Court decided *Harper, supra,* which casts doubt on the *Chevron Oil* equity approach to prospective application of federal judicial decisions, and requires reanalysis of that issue.

On March 18, 1993, the ALJ denied San Joaquin Handlers' 15(A) petition to void the post–1984 marketing orders and accompanying prorate regulations. *See Decision and Order* (filed March 18, 1993) (SC's Exhibit

---

**18.** In its motion for summary judgment, Sequoia alleged that Stark's illegal activities extended over the 1986–87, 1987–88 and 1988–89 growing seasons. However, in its complaint, Sequoia alleged FCA violations only for the 1987–88 growing season and no amendment or supplement was made to the complaint to include the additional period of allegedly unlawful activity.

**19.** While the Ninth Circuit in *Sequoia v. Yeutter* addressed the validity of the Secretary's action only with respect to the Valencia orange marketing order, both the Valencia and navel orange orders were considered and amended during the same rulemaking proceedings. The Ninth Cir-

cuit held that the Valencia order was amended in 1984 in violation of the notice and comment provisions of the APA. Because the navel order suffers from the same procedural error which rendered the Valencia amendments void, the analysis in *Stark* discussed both the navel and the Valencia orange marketing orders.

**20.** The Ninth Circuit denied without comment a 28 U.S.C. § 1292(b) certification from this Court, at the request of all parties in *Stark,* for clarification of its order, invalidating the 1985 amendments.

37).[21]  The ALJ left to the Court the question of whether the Secretary's "reinstatement" of the pre-amendment marketing orders and announcement that weekly prorate would not be issued for the remainder of the 1992–93 season was sufficient compliance with *Sequoia*'s remand order.  The JO affirmed the ALJ's decision with minor modifications.  This led to the 15(B) action in *Sunny Cove v. Espy*, challenging the continued lawfulness of the orange marketing orders after the 1992 *Sequoia* decision and the Secretary's subsequent decision to terminate the rule making proceeding and "reinstate" the pre-amendment marketing orders.

SC asserts that the invalidation of the amendments to marketing orders 907 and 908, coupled with the tendency finding that all 21 amendments had to be approved, has the effect of terminating marketing orders 907 and 908 because they no longer effectuate the purpose of the AMAA.  At the least, it argues, the Secretary was required to engage in notice and comment rule making to address the continued viability of those marketing orders, as the Ninth Circuit directed.

For the reasons stated below, SC's motion for summary judgment will be granted, in part.  The Secretary has failed on remand to follow the Ninth Circuit's direction in *Sequoia* that the Secretary, by notice and comment rule making, address his 1984 tendency finding that without all 21 amendments, the pre-amendment marketing orders should be terminated.  *See* 49 Fed.Reg. 29071, 29088 (July 18, 1984); 973 F.2d at 758.  The Secretary was not required to amend or terminate the pre-amendment marketing orders, however, the appeals court remanded for the Secretary to address his 1984 tendency finding in compliance with the APA.  The Secretary has not done so.  Instead, he "reinstated" the pre-amendment marketing orders, without APA compliance, and terminated prorate regulations.  No party contends prorate termination is unlawful.

## V.  *DISCUSSION*

### *The Parties' Contentions*

SC asserts the U.S.'s forfeiture complaint depends upon the validity of the 1985–86

through 1990–91 prorate regulations, which are unlawful.  Specifically, SC argues: (1) the USDA's continued violation of the notice and comment provisions of the APA in instituting weekly prorate regulations renders the regulations and any obligations imposed thereby unenforceable; (2) the USDA's unlawful promulgation of the amended naval and Valencia marketing orders renders the marketing orders and all the obligations imposed thereby unenforceable; and (3) the Ninth Circuit's decisions in *Riverbend* and *Sequoia* must be applied retroactively.

The U.S. contends: (1) it complied with § 553 and that the record reflects adequate discussion of the need for prorate regulations during the applicable time periods to provide contemporaneous agency explanation to satisfy judicial review; (2) many of the *District I* APA based challenges were rejected in *Riverbend;* and (3) the *Stark* ruling should stand because pre-amendment marketing order 907 remained in effect from 1985 to the present, validating prorate regulations.

The U.S. states it has calculated the forfeitures alleged against Sunny Cove based on the 1985 [amended] version of the marketing orders, which results in decreased liability for SC; i.e., SC is not harmed.  It argues the 1985 amended orders remained in effect from January 11, 1985, until September 15, 1992, and that severely inequitable effects would occur if the amendments were ruled invalid retroactive to 1985.

SC concedes that the invalidation of a regulation generally has the effect of reinstating the prior regulation.  *See, e.g., Rodway*, 514 F.2d at 817; however, here reinstatement of the pre-amendment marketing order is allegedly foreclosed by the Secretary's determination, on July 18, 1984, July 24, 1984, and the original referendum ballot mailed to all orange handlers, that the pre-amendment marketing order should terminate because it no longer effectuated the purposes of the AMAA.

The Orange Cove–Sanger Citrus Association's *Amicus Curiae* brief argues that: (1)

---

**21.**  In light of the JO's previous decisions rejecting the petitioner's essential contentions, the

15(A) petition was handled on an expedited basis.

the marketing orders were terminated after promulgation of the invalid amendments; and (2) the retroactive effect of *Sequoia* is not at issue because *Sequoia* did not change the case law.

### Undisputed Legal Issues

1. Although during the 1986–1989 seasons, prorate regulations were promulgated with notice and comment, the U.S. did not reply to those comments.[22] For the 1989–90 season the U.S. went back to giving no notice and no comment.

2. From 1986–89 through 1989–90 prorate regulations were promulgated under invalidly amended marketing orders.

3. SC does not contend the pre-amendment marketing orders were issued in violation of the APA, nor that the Secretary was not authorized to promulgate prorate thereunder.

### Issues Presented

Whether the disputed prorate regulations:

1. promulgated in violation of proper APA notice and comment procedures are invalid;

2. were accompanied by a sufficient statement of basis and purpose;

3. when commented upon, were not replied to by the Secretary; and

4. are invalid *ab initio?*

### Effect of the USDA's Non Compliance with APA Notice and Comment on Weekly Prorate: Riverbend

■ SC argues: (1) the USDA was required to comply with Judge Price's unstayed *Riverbend* memorandum decision and violated his order by not demonstrating or even claiming an actual emergency existed to justify exemption from APA notice and comment rule-making; (2) the Secretary unlaw-

fully instituted prorate regulations in the same manner from 1985 to the present which contain deficient basis and purpose statements; (3) *Riverbend* applies retroactively.

The U.S. contends no binding injunction prohibiting prorate regulations without notice and comment issued until March 22, 1990, if then; well after most of SC's overshipments during the 1989–90 navel orange season. Judge Price's initial *Riverbend* decision did not enjoin the USDA from issuing prorate regulations during the 1989–90 season. This issue was decided when SC's motion for contempt sanctions was denied.[23]

The U.S. notes that each prorate regulation issued during the 1989–90 navel orange season was accompanied by a finding that notice and comment rule making was "impractical, unnecessary and contrary to the public interest." The findings were premised on the assertion there was insufficient time between when critical information became available and when the regulation must be issued; but that interested persons were given opportunity to present their views at the weekly NOAC meeting.

The first 1989–90 prorate regulation was published November 1, 1989, without any notice and comment and made effective immediately. SC argues that the information cited in the final rule to justify volume restrictions, establishes that most of the information was available sufficiently in advance of the order to permit routine notice and comment rule making. The need to base NOAC weekly recommendations on the most current market information, was found in *Riverbend* inadequate justification for abrogation of notice and comment:

> Plaintiffs argue that the good cause exception cannot justify the wholesale abandonment of the APA's requirements week in and week out, year in and year out, for the

---

22. At oral argument, SC conceded that from the 1986–1989 seasons, the U.S. did give notice and opportunity to comment. However, SC argues that the U.S. violated the APA because it never replied to those comments.

23. The period at issue was the navel orange marketing season running from November 3, 1989 through March 23, 1990. On June 13, 1989, the Secretary filed a motion to alter or amend judgment or for a stay pending appeal.

On December 11, 1989, Judge Price denied plaintiff's motion, stating for civil contempt stating that a final judgment on the matter had not been entered and the Secretary's motion for reconsideration was still pending. The only period during which the Secretary may have been in violation of Judge Price's June 1, 1989 Order was during the first month of the navel orange season: November, 1989.

entire life of a regulatory program. The Secretary counters that the regulatory process simply could not be carried out if he were required to follow APA procedures (which often take weeks or months) for rules that must be put into effect almost immediately and that have an effective life of exactly one week. We agree with both parties.

958 F.2d at 1484. *Riverbend* concluded:

> ... the Secretary's rulemaking fails to satisfy the APA's requirements because he has not demonstrated good cause for failing to give sufficient notice in the Federal Register of the weekly NOAC meeting and failing to allow the public to comment by means other than personal participation at the NOAC meeting.

*Id.* at 1487.

The U.S. does not argue it should have corrected these failures; rather, it claims that since the Secretary followed essentially the same rule making procedure before 1985 as after, that *Riverbend*'s harmless error analysis applies during either period.

SC claims that *Riverbend* found only the 1975–1985 violations to be harmless. SC's motion attacks violations for 1985–1991 in reliance on its stated position that prorate regulations were unlawful. This argument is not well-taken. Under § 608c(15)(B), pending proceedings do not impede, hinder or delay the United States or the Secretary from obtaining relief pursuant to § 608a(6). *See* § 608c(15)(B).

According to the Ninth Circuit, the failure to provide notice and comment is harmless only where the agency's mistake clearly had no bearing on the procedure used or the substance of the decision reached. *Sagebrush Rebellion, Inc. v. Hodel*, 790 F.2d 760, 764–65 (9th Cir.1986) ("*Sagebrush*"). Section 553(b) exempts from formal notice, situations where persons subject to the proposed regulations have actual notice. *See Rodway*, 514 F.2d at 815. The decision in *Riverbend* recognized that "all parties before us knew the ground rules." 958 F.2d at 1487–88. SC was a plaintiff in *Riverbend* and as the Ninth Circuit noted: "Plaintiffs do not claim they were unaware of the Tuesday meetings." *Id.* at 1488. It is unclear how SC has been prejudiced by the procedural errors identified in *Riverbend*. In light of the surrounding circumstances, SC had the same notice and opportunity to comment post–1985 as pre–1985. The Ninth Circuit did not confine its decision to pre–1985 prorate regulations, but rather addressed the procedure used to promulgate prorate regulations. Moreover, the Court gave the Secretary until the 1992 season to implement APA procedural compliance for promulgating prorate.

■ SC argues the prorate regulations contain deficient basis and purpose statements. *See* 5 U.S.C. § 553(c). The U.S. submits that preambles to the prorate regulations, issued during the 1989–90 season, constitute an adequate statement of basis and purpose when considered in the context of how this unique regulatory program operated and in light of other contemporaneous documents discussing the broader issues relating to the use of volume regulation during the 1989–90 season. *See* SC Exhibit 13. The U.S. also points to the Marketing Policy and the internal USDA documents analyzing the Marketing Policy and critical comments issued during the 1989–90 navel season as evidence of its basis and purpose.

The reason for the basis and purpose statement, at least in part, is:

> to respond in a reasoned manner to the comments received, to explain how the agency resolved any significant problems raised by the comments, and to show how that resolution led the agency to the ultimate rule.

*Rodway*, 514 F.2d at 817 (*cited in Sequoia*); *see also Automotive Parts & Accessories Ass'n v. Boyd*, 407 F.2d 330, 338 (D.C.Cir. 1968) (the function of a statement of basis and purpose in informal rule making is to enable the reviewing court "to see what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them as it did.").

"Some courts have held that agency action is arbitrary and capricious if the agency has not really taken a 'hard look' at the salient problems and has not genuinely ·engaged in reasoned decision-making." *Riverbend*, 958 F.2d at 1488 (quotations omitted). *Citizens*

*to Preserve Overton Park Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) requires an agency to produce a record that delineates the path by which it reached its decision in order to allow for meaningful judicial review. A "hard look" review of informal rule making involves a determination of whether a reasonable person would accept the factual premises of the regulation, based upon the notice of proposed rule making, the final rule, the statement of basis and purpose, and documents prepared by the agency, which generally make up the administrative record of informal rule making. *See* E. Gellhorn and R. Levin, ADMINISTRATIVE LAW AND PROCESS IN A NUTSHELL, p. 108–09; *see also Data Processing,* 745 F.2d at 684.

> At most, *Overton Park* suggests that § 706(2)(A) of the APA, which directs a court to ensure that an agency action is not arbitrary and capricious or otherwise contrary to law, imposes a general *"procedural"* requirement of sorts by mandating that an agency take *whatever steps* it needs to provide an explanation that will enable the court to evaluate the agency's rationale at the time of decision.

*Pension Benefit Guaranty Corp. v. LTV Corp.,* 496 U.S. 633, 654, 110 S.Ct. 2668, 2680, 110 L.Ed.2d 579 (1990) (*"Pension Benefit"*).

"The basis and purpose statement is inextricably intertwined with the receipt of comments." *Rodway,* 514 F.2d at 817. In *Riverbend,* SC argued all prorate regulations should be set aside for failure to engage in reasoned decision making, because the Secretary relied on the NOAC to collect data from the growers and make recommendations for the weekly volume restrictions. Although the Court did not expressly address the USDA's statement of basis and purpose, it had "no difficulty with the Secretary's decision to rely on the NOAC to filter and digest public comments and to make a recommendation.... Here the record makes clear that the Secretary does not rubber stamp the NOAC's recommendations." *Riverbend,* 958 F.2d at 1488. The Court's concern was with procedure, not the substance of the volume restrictions. *Id.* at 1489. *Riverbend* held that the prorate regulations were promulgat-

ed in violation of the specific dictates of the APA's notice and comment requirements, but declined to hold that the Secretary's failure to properly comply with the notice and comment procedures in the past served to invalidate past volume restrictions, or that the Secretary's actions were arbitrary and capricious. *Id.* at 1488; *cf. Arlington,* 543 F.2d at 1101 (Secretary's failure to publish announcement in the Federal Register and failure to publish a basis and purpose statement did not render the announcement ineffective as to the parties in the litigation, where no contention was made that any person was not given a full, fair opportunity to participate in the rule making process); *Cal–Almond,* 14 F.3d at 442 (where basis and purpose of assessment rate was obvious, no express statement necessary). The same reasoning applies here, to make harmless the alleged failure to "publish" basis and purpose statements.

*Application of Harper to Riverbend*

The Supreme Court in *Harper* held that its application of a rule of federal law to the parties before it requires every court to give that rule retroactive effect:

> When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule.

— U.S. ——, ——, 113 S.Ct. 2510, 2517 (1993). *Harper* holds: "After the case announcing any rule of federal law has applied that rule with respect to the litigants before the court, no court may refuse to apply that rule." *Harper* at ——, 113 S.Ct. at 2517 (citing *James Beam Distilling Co. v. Georgia,* 501 U.S. at 540, 111 S.Ct. at 2446).

SC points to no U.S. Supreme Court case applying federal law to the issues of this case. Assuming, *arguendo,* that the principles of *Harper* apply when a federal appeals court announces a rule of federal law and has applied that rule with respect to the litigants before the court; the appeals court in *Riverbend* held the Secretary's procedural error in issuing prorate regulations in violation of the

**688**

requirements for informal rule making was harmless:

> In *Riverbend* [the Ninth Circuit] ultimately concluded that the Secretary's failure to comply with the APA's notice-and-comment requirements in promulgating the weekly navel orange volume restrictions was harmless because the handlers knew that there would be meetings every Tuesday, that the proposed restrictions would be contained in a position paper issued prior to the meetings, and that the meetings would provide the opportunity for public comment. Therefore, the handlers were not prejudiced by the Secretary's failure to follow the notice and comment procedure, and the error was harmless.

*Cal–Almond,* 14 F.3d at 441–42.

Under Ninth Circuit precedent, the failure to follow the procedural requirements of the APA is harmless where the agency's mistake clearly had no bearing on the procedure used or the substance of the decision reached. *Sagebrush,* 790 F.2d at 764–65. The APA itself requires that courts take "due account" of the harmless error rule. *See Riverbend,* 958 F.2d at 1487; 5 U.S.C. § 706. In *Riverbend:* "If the procedural error here is not harmless, it's hard to imagine a case where it would be." *Id.* 958 F.2d at 1488. Since SC was aware of the weekly meetings at which it could comment, SC was not harmed by the Secretary's failure to comply with § 553 in promulgating prorate regulations.

### Effect of Noncompliance with Informal Rule Making Procedures on Pre–Amendment Marketing Orders: Sequoia

█ SC argues: (1) the district court and the Ninth Circuit have ruled that the pre-amendment orders are invalid and cannot be revived; (2) lack of formal termination is immaterial, but the USDA's decision to terminate the pre-amendment orders was not ambiguous; (3) this Court's ruling on retroactivity in *Stark* is in error and the issue should revisited based on *Harper;* (4) arguendo, the *Chevron Oil v. Huson* equity factors support retroactive invalidation of prorate regulations, as applied to SC, from 1984 to the present.

SC claims that after Sequoia's invalidation of the amended marketing orders, all that remains are the Secretary's specific findings, made after formal rule making hearings, that the pre-amendment orders no longer tended to achieve AMAA purposes; i.e., the pre-amendment marketing orders were *de facto* terminated, leaving the Secretary without authority to promulgate prorate regulations.

The argument that the pre-amendment marketing orders were invalidated or terminated, either by operation of the Ninth Circuit's decision in *Sequoia,* or because the Secretary impliedly terminated the marketing orders in 1984, is not persuasive. This argument was expressly rejected in *Stark. See* Opinion Re Effect of *Sequoia Orange Co. v. Yeutter,* filed December 18, 1992, at 11–18. The Ninth Circuit's subsequent amendment to the *Sequoia* decision on March 3, 1993, does nothing to expand its reach beyond the amended orders; *i.e.,* the pre-amendment marketing orders were not invalidated nor did the Secretary terminate the pre-amendment marketing orders.

*Sequoia* dealt with the Secretary's disregard of his tendency finding, made after notice and a hearing, that the "package" voting procedure would tend to effectuate the policy of the AMAA. If the Secretary wished to change that finding, he could do so only after notice and comment. However, the Court declined Sequoia's request to specifically direct the Secretary to adhere to his initial preference for package voting. This left the Secretary's administrative discretion intact. *See Sequoia,* 973 F.2d at 759 (citing *Arlington,* 543 F.2d at 1101).

Sequoia challenged both the procedure used and the substantive decision made by the Secretary in issuing the amended marketing orders, claiming that the Secretary's decision to change the referendum procedure was arbitrary, capricious, and contrary to law; the Ninth Circuit focused exclusively on the procedural validity of the Secretary's actions and found remand sufficient relief. *Sequoia,* 973 F.2d at 759. Whether the change in the voting procedure was inconsistent with the statutory scheme, the Secretary's regulations, or the spirit of the AMAA is properly addressed, first by the Secretary upon remand. *Id.*

Sequoia's argument that the voting scheme unconstitutionally delegated law-making to a minority of growers was expressly rejected. *Id.* (citing *Riverbend*, 958 F.2d at 1488 ("the Secretary is free to seek advice from whatever sources he deems appropriate, so long as he or his delegate … retains ultimate authority")).

*Sequoia* adopted *Arlington*'s reasoning, agreeing with the conclusion that notice and hearing requirements might be meaningless if after announcement of a rule, the agency could closet its intent to reconsider and completely undo the first rule made. *Sequoia*, 973 F.2d at 758 (citation and quotations omitted). "The Fifth Circuit held that the revocation of the original decision was invalid because the APA required the Secretary 'to provide adequate notice that reconsideration was underway and to give all interested persons a reasonable opportunity to participate.'" *Id.* (citation and quotation omitted).

In *Arlington*, 543 F.2d at 1099, the Fifth Circuit held that when the USDA issued a press release in March, 1976, concerning price differentials for the 1976 crop year, it had made a determination that was final and conclusive under 7 U.S.C. § 1429. Any further action by the USDA to alter this final decision fell within the APA's definition of rule making and was subject to the notice and comment procedures of § 553. *Id.* The Secretary was required to give adequate notice that reconsideration was underway and to afford all interested persons reasonable opportunity to participate and present their views, before he issued a July, 1976 USDA press release revoking the March differentials and announcing that the 1976 peanut crop differentials would be the same as for the 1971–75 period. *Id.* The March compliance with APA duties did not apply to validate the July announcement. *Id.*

The Fifth Circuit rejected the Secretary's contention that plaintiffs' actual notice that the March differentials were being reconsidered constituted APA compliance. *Id.* (citing §§ 553(b) & (c)). That Court concluded that, although the actual notice exception applies when a party who has participated in the proceedings seeks to take advantage of some technical default, there the plaintiffs effectively had been prevented from participating in the decision making process in contravention of § 553(c). *Id.*

The court also rejected the Secretary's argument that the March decision was never legally effective because it was not formally published. *Id.* Lack of formal publication does not preclude the effectiveness of otherwise valid agency action. *Id.* Everyone who was a party to the litigation well knew the content of the March announcement, which excused the failure to publish the announcement in the Federal Register and the failure to publish a basis and purpose statement. *Id.* at 1100.

The district court in *Arlington* had reasoned that it was statutorily and pragmatically impossible for the Secretary to conduct further hearings and make a new differential announcement because of the late date and because the case had reached litigation. *Id.* at 1101. The Fifth Circuit rejected this as inconsistent with the plain language of 7 U.S.C. §§ 1423 & 1426. *Id.* Section 1426 provides that the Secretary shall, *insofar as practicable*, announce the level of price support for field crops in advance of the planting season and prior to the time the economic impact of the announcement would be felt on the marketplace. *See id.* Section 1423 contains no time provision for deciding whether adjustments will be announced. *Id.* For the previous five years, the Secretary's announcements had not been issued until well after the planting season was complete. *Id.* While the Secretary's July announcement was procedurally defective under APA standards, it was not inconsistent with the USDA's prior policies governing the timing of peanut differential announcements. *Id.*

The Secretary's statutory direction was clear:

Without reference to time, Congress placed it within the Secretary's prerogative to determine whether he will change the March 19 announcement or allow it to stand. If it is claimed that the procedure and practices he adopted, though consistent with the statute, have caused economic dislocations within the peanut industry, it is for the legislative and not the judicial branch to effect correction.

The Secretary's final and conclusive authority to determine peanut price support levels and differentials should not have been displaced in this case. Under existing legislation, the district court lacked the authority to mandate that the March 19 differentials be implemented. The lower court's correct adjudication of procedural impropriety in the July 6 announcement does not foreclose the Secretary from discharging his statutory duty to determine whether *further* adjustments are required. The cause must be remanded so that the Secretary may set the peanut price support for the 1976 crop in compliance with APA procedures.

*Id.* (emphasis added). The case was returned to the district court with directions to remand for the Secretary to fix proper price differentials for the *1976* crop. *Id.* (emphasis added); *cf. Cal–Almond,* 14 F.3d at 443–44 (retroactive application of reserve allocations authorized by AMAA).

*Arlington*'s reasoning that, under § 553, the plaintiffs were entitled to participate in the decision making process, is analogous to *Walter Holm & Co. v. Hardin,* 449 F.2d 1009, 1014 (D.C.Cir.1971) ("*Hardin*"). There the Court found as a matter of statutory intent that American importers (handlers) of tomatoes, who attacked the validity of USDA size regulations for imported tomatoes, were entitled to effective opportunity to make a presentation to the Secretary on crucial issues. 449 F.2d at 1015. The *Hardin* Court explained that where the importers had made a "not insubstantial claim," effective opportunity meant oral presentation to USDA officials. *Id.* at 1016.

Although the marketing season had expired and the contested regulations were not currently in effect, the issue was not moot since the problem was recurrent in nature and pertained to a matter of public import. *Id.* at 1011. Declaratory relief was in the public interest to resolve the conflict between the parties and to avoid future actions or procedures contrary to law. *Id.* As in *Sequoia,* no substantive issues were reached:

... they may come to have a different cast, in terms of the approach of the Secretary and the illumination that will be provided if court review is sought, if his determinations are made following the procedure to which the importers are entitled.

*Id.* at 1013.

The oral hearing could be legislative in type, "although fairness may require an opportunity for cross-examination on crucial issues:"

This requirement of a hearing is not shackled by rigidities of procedure that may stultify the regulatory program. What counts is the reality of an opportunity to submit an effective presentation, to assure that the Secretary and his assistants will take a hard look at the problems in the light of those submissions. Once the Secretary has made a judgment on the crucial issues on the basis of such a procedure, there is more room to project that future application of the same policy may be wrought by regulations issued after opportunity to file written comment.

The procedure providing effective oral presentation can be carried out with expedition.

*Id.* at 1016; *see also United States v. Mills,* 187 F.Supp. at 317 n. 2 (D.Md.1960).

The *Sequoia* Court found *Hardin* persuasive, noting that in *Hardin,* the Circuit Court "found that regulations issued pursuant to a marketing order should not have been issued without following the procedural safeguards of the APA:"

The essential point is that a procedure not requiring an opportunity for oral presentation to the Department on crucial matters, and not requiring evidence in the record, is a seed bed for the weed of industry domination.

*Sequoia,* 973 F.2d at 758 (quoting *Hardin,* 449 F.2d at 1016).

"Similarly, the district court in [*Sequoia*] felt the Secretary could not change a decision reached after notice and hearing without complying with the APA." *Id.* at 578. The district court had declined to remand the case to the Secretary with specific instructions to issue a marketing order consistent with the Secretary's final decision, *i.e.,* that the marketing orders with all 21 amend-

ments tended to effectuate the purpose of the AMAA:

> ... this request overlooks the great discretion in the Secretary. For instance, 7 U.S.C. section 608c(9) permits the Secretary to issue a marketing order under certain circumstances even though it has not been approved by the requisite number of handlers. Title 7 of the United States Code section 608c(16) provides for the termination of a program by the Secretary upon certain findings.

The Valencia Orange Order, which is under attack here, was issued a number of years ago. It is not for the Court to say what order should be issued today. It is enough for the Court to determine that the Valencia Marketing Order, issued as an amendment to the final decision of the July 18, 1984 final decision was invalid.

*Memorandum Decision,* CV–F–89–632–EDP, p. 3, 1990 WL 429847. The district court did not reach the propriety of the referendum, but concluded that the amendment to the Secretary's final decision was invalid. The district court expressly declined to say *what order should issue today. Id.* at p. 4 (emphasis added). The Secretary could, of course, issue a marketing order under § 608c(9) with approval by 75% of the producers, even without a marketing agreement with handlers, or terminate the pre-amendment marketing orders under § 16(A) without producer or handler approval. The Ninth Circuit affirmed the district court's decision. *Sequoia,* 973 F.2d at 759.

*Sequoia* does not hold that the Secretary was required to terminate the pre-amendment marketing orders. *See* 973 F.2d at 759. In *Sequoia, Arlington,* and *Hardin* the courts remanded to the Secretary to follow appropriate administrative procedures. .

While *Sequoia* was pending, the Secretary announced on April 5, 1991, that, pursuant to the requirements of 7 C.F.R. §§ 907.83, 908.83 (as amended in 1985),[24] referenda would be conducted during June, 1991, to determine whether producers favored *continuation* of the (amended) marketing order programs for both navel and Valencia oranges. *See Cecelia Packing,* 10 F.3d at 620. As the result of a large bloc vote by Sunkist, a producer cooperative, which accounted for 80% of the navel orange industry voting and 85% of the Valencia orange industry voting, both the marketing orders were continued by a large margin. *See id.*

In 1993, noting that it had previously held in *Sequoia* that the procedures used by the Secretary to adopt the 1985 amendments were improper under the APA, the Ninth Circuit upheld the bloc voting referendum procedure. *Id.* at 618 n. 1. The decision in *Sequoia* did not affect the Court's review of the issues in *Cecelia Packing,* because even without the amendments, the Secretary retains the statutory authority under the AMAA both to terminate marketing orders and hold referenda. *Id.;* 7 U.S.C. 608c(16). The Secretary expressly invoked these general statutory powers when announcing the 1991 referenda. *See Cecelia Packing,* 10 F.3d at 618 n. 1.

The 1991 producer vote to continue the (amended) marketing orders did not comply with the Ninth Circuit's decision in *Sequoia.* The Secretary *shall* terminate a marketing order whenever he finds that termination is favored by a majority of the commodity's producers *or whenever he finds* that it does not tend to effectuate the policy of the AMAA. *See Cal–Almond, Inc. v. USDA,* 960 F.2d 105, 110 (9th Cir.1992) (emphasis added); 7 U.S.C. § 608c(16)(B).

While *Sequoia* did not hold that the Secretary was required to terminate the pre-amendment marketing orders, *see Pescosolido,* 765 F.2d at 830, the Court did observe

---

**24.** The 1985 amendments to the orange marketing orders required the Secretary to conduct a referendum at a minimum of every six years. *See Cecelia Packing,* 10 F.3d at 618; 7 C.F.R. §§ 907.83, 908.83 (1993); *see also, supra,* note 8. Prior to the 1985 amendments, the Secretary could conduct referenda under § 16(B) at any time to determine whether the orange growers in the region favored *continuing* the marketing orders. *See id.;* 7 C.F.R. §§ 907.83, 908.83 (1984) (emphasis added). As discussed above, under § 16(B), the Secretary shall terminate a marketing order whenever he finds the termination is favored by a majority of the commodity's producers. *See Cal–Almond, Inc. v. USDA,* 960 F.2d at 107. Termination under 16(B) does not provide for termination referenda on any regular basis. *Id.*

that the Secretary "had *made at least an implicit value judgment* that without the amendments the marketing order should be terminated." 985 F.2d 1419. In addition, although not specifically addressed in *Sequoia*, the USDA's July 24, 1984, press release provides:

> Based on a lengthy hearing record established by the industry, the secretary of agriculture has determined that, *without the proposed amendments, the orders do not tend to effectuate the purposes of the act,* hence the proposed amendments are necessary.
>
> The vote of the growers will be on the orders as proposed to be amended and not solely on the amendments themselves.
>
> A USDA official announced: "If three-fourths of the growers voting, or growers of two-thirds of the volume of production represented in the referenda, do not favor the marketing orders, as proposed to be amended, the *failure of the favorable vote would terminate the marketing orders."* (Emphasis added.)

Under *Arlington,* 543 F.2d at 1101, the Secretary's failure to publish the press release in the Federal Register does not render the announcement ineffective.

SC contends that, since the last valid action by the Secretary was a "final determination" that the pre-amendment marketing orders no longer effectuated the purpose of the AMAA, to reinstate the marketing orders "flies directly in the face of the Secretary's lawful finding that the 21 amendments were necessary to support the continuation of the marketing orders." SC argues that setting aside the Secretary's "unlawful reversal of his final decision" without notice and comment rule making leaves the final decision in place.

The U.S. responds that because the appeals court in *Sequoia* expressly rejected Sequoia's request for a remand with instructions on how to proceed, the Secretary had the options either to: (1) allow notice and comment on the new referendum procedures; (2) conduct the referendum as initially pro-

posed; (3) reopen the entire rule making, or (4) terminate the rule making. The U.S. argues to do the latter was reasonable, and that over the past few months, the USDA has instituted a new rule making proceeding to amend the orange marketing orders.

SC counters that the Secretary's September 15, 1992 effort to "reinstate" the pre-amendment orders without employing notice and comment rule making is in violation of the APA for the same reasons stated in *Sequoia*.[25] SC argues the termination of rule making "ignores the Ninth Circuit's remand instructions in *Sequoia* to implement new orders according to the APA and the AMAA" and that the USDA's decision to continue the orders without the amendments is even more unlawful than the USDA's decision to continue with less than all the amendments.

The weakness in SC's position is that the Ninth Circuit expressly declined to find that the Secretary terminated pre-amendment marketing orders. *See Sequoia,* 985 F.2d 1419. Generally, unless the prior regulations are found invalid, vacating or rescinding invalidly promulgated regulations has the effect of reinstating the prior regulations. *Abington Memorial Hospital v. Heckler,* 750 F.2d 242, 244 (3d Cir.1984) (the district court did not find that a prior regulation was invalid, but noted that the Secretary believed the prior regulation was invalid).

In one case where the Secretary failed to comply with the procedural commands of the APA in promulgating regulations, the court returned the case to the Secretary for an APA rule making proceeding, but did not order the invalidly promulgated regulations vacated pending those proceedings. *Rodway,* 514 F.2d. at 817 ("mindful of the critical importance of the allotment regulations to the functioning of the entire food stamp system, on which over ten million American families are now dependent to supplement their food budgets.... we do not order the regulations vacated pending the rule-making proceedings. Rather they must continue in

---

**25.** In ruling on SC's (15)(A) petition, the ALJ did not decide whether the Secretary's response to *Sequoia* in terminating the 1985 rulemaking ac-

tion and reinstating the pre-amendment orders complied with the Ninth Circuit's remand order.

effect, and the Secretary must continue to make cost of living adjustments mandated by the Act ..., until validly promulgated regulations can take their place."). The *Rodway* Court emphasized, however, that the transition should occur with expedition. *Id.* "In matters as vital as basic nutrition there is no excuse for delay, especially when this litigation has already dragged on for over three years." *Id.* The Court gave the Secretary 120 days to complete the new rule making process. *Id.* at 818.

When faced with a notice provision that had never been validly adopted and had been declared invalid, the Court in *American Dairy v. Bergland,* 627 F.2d 1252, 1261 (D.C.C.1980), ordered the case remanded to the Secretary for adoption of a new provision based on the existing record for the years in question, or for an entirely new hearing on the pricing formula and notice provision, at the Secretary's discretion. *Id.* The Secretary in the interim was directed to use the same notice provision for Class I milk until a Class II notice provision was adopted after notice and an hearing and/or findings. *Id.* Having concluded that the challenged notice provision was invalid, the Court left it to the Secretary to issue a new notice provision supportable on the record:

> In almost a decade this administrative agency has failed to produce a decision sustainable on an adequate record. While recognizing that the ultimate answer on the merits of milk pricing rests with the Secretary, the aggregate record of this decade long administrative morass is equivalent to administrative action unlawfully withheld. The courts have power to compel administrative action in such circumstances; [*see* 5 U.S.C. § 706(1)] by granting the private parties here the relief they have sought for years, although on an interim basis, we expect proper and prompt administrative action on a sound record to result.

*Id.* at 1262.

The instant litigation began almost ten years ago in 1985, with Sequoia's first 15(A) petition. Two administrative records have resulted, the district court 15(B) decisions, and the Ninth Circuit's decision, August 21, 1992. Like *Arlington,* here the Secretary's last valid act regarding the amendment of marketing orders 907 and 908 was his 1984 decision that, without all 21 amendments, the pre-amendment orders should be terminated. In conducting a producer referendum on the proposed amendments, the Secretary was bound by his tendency finding, which he could change only after notice and comment. The *Sequoia* Court did not say what marketing orders (or prorate regulations) would be in effect for the time period at issue, that was for the Secretary to determine first. However, the message to the Secretary has been clear—the amendment of marketing orders in disregard of tendency findings, without notice and comment rule making, is unlawful.

More than a year and a half have passed since *Sequoia* instructed the Secretary to address his previous finding. On September 21, 1992, the Secretary purported to "reinstate" the pre-amendment marketing order and stopped issuing prorate, but still has not complied with the command of the Ninth Circuit and this Court to engage in lawful rule making on the subject. The Courts' approach accorded proper deference to the Secretary to fulfill the USDA's statutory duties in the area of its expertise, the navel and Valencia orange industries.

At bottom of the uncertainty that has plagued these marketing order cases is the difference between what *Riverbend* and *Cal–Almond,* 14 F.3d at 441–42, decided about non-prejudicial violations of notice and comment rule making in issuing prorate and *Sequoia's* invalidation of marketing order amendments and its remand to the Secretary to address the pre-amendment marketing orders in compliance with the APA.

There is no dispute that the pre-amendment marketing orders were validly issued. Whether or not the decision in *Sequoia* had the effect of properly "reinstating" the pre-amendment marketing orders cannot be determined because the Secretary has yet to provide the Court with a decision sustainable on the record, other than that the pre-amendment marketing orders should be terminated without approval of all 21 amendments. The Secretary has not terminated the marketing orders, *see Pescosolido,* 765

F.2d at 830, nor has he explained why his failure to do so does not violate the AMAA.

### Application of Harper to Sequoia

The U.S. invokes the Court's equity power and requests a finding that an inability to enforce 1985–1991 prorate regulations under the authority of the pre-amendment marketing orders would cause great hardship. *See Western Oil & Gas v. E.P.A.,* 633 F.2d 803, 813 (9th Cir.1980). This request is premature. Until the USDA addresses the pre-amendment orders, the validity of the 1985–1991 prorate regulations cannot be finally decided.

Prior to the Supreme Court's ruling in *Harper,* this Court in *Stark,* applied the *Chevron Oil* equity analysis[26] to determine that the Ninth Circuit's decision in *Sequoia,* invalidating the improperly enacted amendments to the marketing order, should be given prospective effect only.[27] "[T]he legal imperative to apply a rule of federal law retroactively after the case announcing the rule has already done so must prevail over any claim based on a *Chevron Oil* analysis." *Harper,* —— U.S. at ——, 113 S.Ct. at 2518 (quotations omitted). According to *Harper,* "the *Chevron Oil* test cannot determine the choice of law by relying on the equities of the particular case ... the federal law applicable to a particular case does not turn on whether litigants actually relied on an old rule or how they would suffer from retroactive application of a new one." *Id.* at ——, 113 S.Ct. at 2516 (quotations omitted).

Applying *Sequoia* retroactively invalidates the improperly promulgated amendments from their inception. The Ninth Circuit has done this. The retroactive invalidity of the 1985 amendments does not, however, resolve the questions left open in *Sequoia.*

There is no Supreme Court or Ninth Circuit decision that addresses the substantive validity of the pre-amendment marketing or-

ders after the Secretary's tendency finding, or that invalidates 1985–1991 prorate regulations.[28] Neither *Riverbend* nor *Sequoia* address whether termination of the pre–1985 amendment marketing orders around the time of the tendency finding would affect 1985–1992 prorate regulations.

In May 1992, the *Riverbend* Court addressed the orange "regulatory system" and observed that "[f]or the most part, the regulations promulgated [pursuant to the 1954 marketing order] still govern the navel orange market," *Riverbend,* 958 F.2d at 1483, and declined to hold the Secretary's actions arbitrary and capricious, or that his procedural mistakes "of the past" invalidated prorate regulations. Instead, that Court found prorate regulations issued prior to 1992 were *not* invalid, because the error in failing to follow APA notice and comment requirements was harmless due to the availability of the Tuesday meetings and opportunity for public comment which avoided prejudice to handlers, and gave the Secretary until the 1992 season to correct his mistakes in implementing prorate regulations. *See id.* at 1488, 1489. If, five months later in *Sequoia,* the Ninth Circuit had intended to overrule its decision in *Riverbend* by invalidating pre–1992 prorate regulations, the Court simply could have done so. It did not.

The U.S. asserts that liability for post-amendment prorate violations is authorized by the pre-amendment marketing orders under the harmless error analysis, because SC's liability for violations of the prorate orders under the amended marketing orders is less than it would have been under the pre-amendment orders. The harmless error analysis must, however, focus on process as well as the result. *Riverbend,* 958 F.2d at 1487. "An agency may rely on harmless error only when its mistake is one that clearly had no bearing on the procedure used or the substance of decision reached." *See*

**26.** The analysis is set forth in *Stark* at pp. 19–27, it will not be repeated here.

**27.** *Stark* did not address the issue of whether the Secretary's decision on September 15, 1992 to terminate the remanded orange rulemaking and "reinstate" the pre–1984 amendment marketing orders was arbitrary and capricious.

**28.** Because the Ninth Circuit held that the amendments were procedurally invalid, there was no need for the Court to determine if any other provision of § 706 applied to invalidate the agency action.

*Sagebrush,* 790 F.2d at 765 (quotations omitted). Marketing orders are the means by which the Secretary is to promulgate prorate regulations. *See Wileman,* 909 F.2d at 334; *see also* § 608c(7).

Unlike *Riverbend,* which found that the Secretary's APA violations nonprejudicial because all the parties knew the ground rules and had the opportunity to participate, *Sequoia* remanded the issue of the marketing orders to the Secretary for proper rule making. The *Sequoia* decision left it to the Secretary to proceed, reasoning that many years had passed and the procedural invalidity of the decision to change the voting procedure did not warrant the total displacement of the Secretary's function. *Sequoia,* 973 F.2d at 759. The Ninth Circuit did not, of course, rule on the merits of the questions left to the Secretary. The Secretary's response, terminating prorate and instituting "new" notice and comment proceedings appears to be a suspension of a regulatory restriction. *Cf. Western Dairymen,* 1990 U.S.Dist. Lexis 3950 *20 (suspension order did not amend the prices at which handlers must purchase milk or a create a new exemption under the AMAA, but rather lifted a regulatory restriction previously in place). The Secretary need not conduct a hearing to suspend a marketing order or provision thereof.

At the same time, however, the Secretary seeks to enforce prorate regulations under the authority of the pre-amendment marketing orders. "SC does not dispute that the Secretary was authorized to issue prorate," but objects that the prorate issued from 1985 through 1991 was not issued under the pre-amendment marketing order, but rather under the invalid amended marketing orders. SC argues to allow enforcement of 1985–1991 prorate regulations under the pre-amendment marketing orders would sanction retroactive rule making, which Justice Scalia rejected in *Bowen v. Georgetown University Hosp.,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) (Scalia, J. concurring).

In *Cal–Almond,* 14 F.3d at 444, the Ninth Circuit held that even if reserve obligation rules were retroactive, they were expressly authorized by Congress and were therefore valid:

> The Act provides that marketing orders may contain terms:
>
>> [a]llocating or providing methods for allotting, the amount of [a] commodity ... which each handler may market ... under a uniform rule based upon the amounts which such handler has available for current shipment, or upon the amounts shipped by each such handler in such prior period as the Secretary determines to be representative, or both, to the end that the total quantity of such commodity ... to be marketed ... during any specified period or periods shall be apportioned among all handlers thereof.
>
> 7. U.S.C. § 608c(6)(C) (1988). The focus of the statute is on the total quantity of almonds to be marketed during any period specified by the Secretary.... The state requires the total quality of almonds saleable during this period to be allotted "equitably" among handlers. To do so the Secretary has to take into account almonds shipped between the beginning of the crop year and the issuance of the final reserve rule. Thus, the reserve allocation rules, even if retroactive, are authorized by the Act.

*Id.* at 444.

*Sequoia* left the Secretary free to change his prior final decision about the referendum procedure by proper notice and comment rule making, not the trial type procedures of formal rule making. *Cf. Pension Benefit,* 496 U.S. 633, 110 S.Ct. 2668, 110 L.Ed.2d 579 (agency determination not unlawful because informal adjudication does not require the trial-type procedures of formal adjudication). Notice and comment rule-making is designed to ensure public participation. *See Riverbend,* 958 F.2d at 1485. An agency is not required to adopt a rule that conforms in any way to the comments presented to it. So long as it explains its reasons, it may adopt a rule that all commentators think is "stupid or unnecessary." *Id.* at 1487; *see also Data Processing,* 745 F.2d at 684.

The Secretary's true procedural error in changing his mind on the producer referen-

dum voting procedure was in failing to explain his decision on the record and not giving all parties the opportunity to participate in the reconsideration of his tendency finding. *See Sequoia,* 973 F.2d at 758; *Pescosolido,* 765 F.2d at 830 (in reviewing an *order after* the Secretary has made the appropriate findings, courts generally are not free to examine evidence outside the Secretary's record). In *Sequoia,* although observing "there is *no administrative record to review the abrupt decision to change the voting procedure."* 973 F.2d at 756 (emphasis added), the Ninth Circuit did not set aside the pre-amendment marketing orders or the prorate regulations issued under the improperly amended marketing orders. Under Supreme Court precedent, where a fuller explanation of the agency's reasoning at the time of the action is needed, remand is the preferred course. *See Pension Benefit,* 496 U.S. at 654, 110 S.Ct. at 2680. "[I]f the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 744, 105 S.Ct. 1598, 1607, 84 L.Ed.2d 643 (1985). (as cited in *Pension Benefit,* 496 U.S. at 654, 110 S.Ct. at 2680).

The U.S. argues that the Secretary's decision on remand to stop issuing prorate regulations must be judged with great deference, "balanced against the statutory language of both the APA and the AMAA, and the facts upon which the Secretary of Agriculture predicated his final decision." This argument ignores the Secretary's tendency finding in 1984 and that there is no record which permits review of the Secretary's decision.

> The agency must articulate a "rational connection between the facts found and the choice made." "While we may not supply a reasoned basis for the agency's action that the agency itself has not given, * * * we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."

*Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974). The Secretary's "reinstatement" of the pre-amendment marketing order, and simultaneous suspension of prorate regulations, without explanation, do not sufficiently address the Secretary's prior tendency finding. In "reinstating" the pre-amendment marketing orders, the Secretary gave no reasons for his reversal of his earlier decision that, without all 21 amendments, the pre-amendment marketing order should be terminated. *Cf. Western Dairymen,* 1990 U.S. Dist.Lexis 3950 *26 (Secretary's suspension was adequately supported by the record where he made clear he was not reversing his earlier decision and gave reasons for his decision). There is no explanation in the record to support the Secretary's actions.

The producer referendum conducted on April 5, 1991, approving the continuation of the amended marketing orders, does not render the Secretary's failure to terminate the pre-amendment marketing orders harmless where the Secretary is under a statutory obligation to terminate orders, found to no longer tend to effectuate the purpose of the AMAA. "When the Secretary comes himself to make a determination of crucial facts and conclusions, he must think in terms of support in evidence and general standards, and cannot be guided solely by deference to industry desires." *Hardin,* 449 F.2d at 1016 (as quoted in *Sequoia,* 973 F.2d at 758).

The Secretary is not entitled to justify his actions with post hoc rationalizations. *See Rodway,* 514 F.2d at 817. *Sequoia's* concern was that, in changing the voting procedure, the Secretary had not responded to comments in a reasoned manner nor explained how the agency had resolved problems. *See Sequoia,* 973 F.2d at 758 (citing *Rodway,* 514 F.2d at 817). *Sequoia's* citation to *Arlington,* 543 F.2d at 1101, suggests that the Secretary could have reconducted the 1984 referenda proceedings for marketing orders 907 and 908 in compliance with the APA. *See also Cal–Almond,* 14 F.3d at 443 (the AMAA authorizes retroactive application of reserve allocations under § 608c(6)(C)). The marketing orders could have been terminated retroactive to the time the Secretary found they no longer effectuated the purpose of the AMAA or the Secretary could have

attempted to explain on the existing record that the failure to terminate the marketing orders did not conflict with the AMAA or the Secretary's regulations. The Secretary has done none of these things, but rather now attempts to rely on the pre-amendment marketing orders without any explanation for his change in position or opportunity for public participation, despite orders to do so from the district and appeals courts. The harmless error analysis may or may not apply, dependent on the outcome of future administrative proceedings concerning the pre-amendment marketing orders.

In *Cal–Almond*, the Ninth Circuit stated that it had found no cases holding that an agency's delay in issuing a rule, makes that rule itself arbitrary and capricious. 14 F.3d at 444. In reaching this conclusion, however, the Court distinguished cases addressing the adequacy of agency explanations of the *contents* of their rules, not the delays in promulgating them. *Id.* n. 14 (emphasis in original) (citing *See, e.g., North Germany Area Council v. Federal Labor Relations Auth.*, 805 F.2d 1044 (D.C.Cir1986) ("*NGAC*") and *Celcom Communications Corp. v. FCC*, 789 F.2d 67 (D.C.Cir.1986) ("*Celcom*").

In *NGAC*, the Court could not conclude that the Federal Labor Relations Authority supplied a reasoned explanation why information requested by a union regarding discipline of nonbargaining unit management officials and supervisors was not necessary to assist the union in its representation of a union employee. 805 F.2d at 1050. An agency's construction of its statute will be upheld if it is reasonably defensible. *Id.* at 1049.

> Despite this generally deferential standard, the Supreme Court has cautioned that "while reviewing courts should uphold reasonable and defensible constructions of the agency's enabling Act, they may not 'rubber stamp ... administrative decisions that they deem inconsistent with the statutory mandate or that frustrate the congressional policy underlying a statute.'"

*Id.* at 1050 (citations omitted).

In *Celcom*, the Court remanded the case to the FCC so that it could more thoroughly address a particular issue that was not artic-ulated with sufficient clarity or specificity to permit the court to engage in meaningful review. 789 F.2d at 71. "A reviewing court cannot do the agency's work for it; that is, the judiciary may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id.* (quotations omitted).

In the present case, the Secretary was given opportunity by the district court in 1989 and by the appeals court in September 1992, to address his previous tendency finding. The Secretary still has not provided a reasoned basis on the record for his actions disregarding the tendency finding. Enforcement of prorate regulations pursuant to marketing orders that tend not to effectuate the purpose of the AMAA is "inconsistent with the statutory mandate" and would "frustrate the congressional policy underlying [the AMAA]." Such action cannot be upheld.

## VI. SUMMARY JUDGMENT STANDARD

The Court must render summary judgment if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A factual dispute is "material" only if it might affect the outcome of the suit under governing law. *Id.* at 248, 106 S.Ct. at 2510. Inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## VII. CONCLUSION

For the foregoing reasons, SC's motion for summary judgment is granted, in part. The Court finds on the basis of the record that the exercise of administrative discretion has been unreasonably delayed and that the reinstatement of pre-amendment marketing or-

ders 907 and 908 is not in accordance with the law and without observance of procedure required by law. The issue of the status of the pre-amendment marketing orders, 7 C.F.R. §§ 907 & 908 (1984), is once again remanded to the Secretary of Agriculture for his findings and determination in accordance with the provisions of the APA and AMAA. The Secretary shall, as to marketing orders 907 and 908, comply with the Ninth Circuit's August 21, 1992, decision and order, within 60 days following the date of service of this order.

SO ORDERED.